# ILLINOIS *v.* WARDLOW

No. 98–1036.   Argued November 2, 1999—Decided January 12, 2000

REHNQUIST, C. J., delivered the opinion of the Court, in which O'CON-NOR, SCALIA, KENNEDY, and THOMAS, JJ., joined. STEVENS, J., filed an opinion concurring in part and dissenting in part, in which SOUTER, GINS-BURG, and BREYER, JJ., joined, *post*, p. 126.

*Richard A. Devine* argued the cause for petitioner. With him on the briefs were *James E. Ryan,* Attorney General of Illinois, *Joel D. Bertocchi,* Solicitor General, *Renee G. Goldfarb, Theodore Fotios Burtzos,* and *Veronica Ximena Calderon.*

*Malcolm L. Stewart* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Waxman, Assistant Attorney General Robinson, Deputy Solicitor General Dreeben,* and *Deborah Watson.*

*James B. Koch* argued the cause for respondent. With him on the brief were *Lynn N. Weisberg* and *Thomas G. Gardiner.**

---

*Briefs of *amici curiae* urging reversal were filed for the State of Ohio et al. by *Betty D. Montgomery,* Attorney General of Ohio, *Edward B. Foley,* State Solicitor, *Robert C. Maier* and *Alejandro Almaguer,* Assistant Solicitors, and *Thomas R. Keller,* Acting Attorney General of Hawaii, and by the Attorneys General for their respective States as follows: *Bill Pryor* of Alabama, *Ken Salazar* of Colorado, *M. Jane Brady* of Delaware,

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

Respondent Wardlow fled upon seeing police officers patrolling an area known for heavy narcotics trafficking. Two of the officers caught up with him, stopped him, and conducted a protective patdown search for weapons. Discovering a .38-caliber handgun, the officers arrested Wardlow. We hold that the officers' stop did not violate the Fourth Amendment to the United States Constitution.

On September 9, 1995, Officers Nolan and Harvey were working as uniformed officers in the special operations section of the Chicago Police Department. The officers were driving the last car of a four-car caravan converging on an area known for heavy narcotics trafficking in order to investigate drug transactions. The officers were traveling together because they expected to find a crowd of people in the area, including lookouts and customers.

As the caravan passed 4035 West Van Buren, Officer Nolan observed respondent Wardlow standing next to the building

*Alan G. Lance* of Idaho, *Carla J. Stovall* of Kansas, *Richard P. Ieyoub* of Louisiana, *Mike Hatch* of Minnesota, *Michael C. Moore* of Mississippi, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *Michael P. Easley* of North Carolina, *W. A. Drew Edmondson* of Oklahoma, *Charles M. Condon* of South Carolina, *Mark L. Barnett* of South Dakota, and *Mark L. Earley* of Virginia; for the Wayne County Prosecuting Attorney by *John D. O'Hair, pro se, Timothy A. Baughman,* and *Jeffrey Caminsky;* for Americans for Effective Law Enforcement, Inc., et al. by *Wayne W. Schmidt, James P. Manak,* and *Richard Weintraub;* for the Criminal Justice Legal Foundation by *Kent S. Scheidegger* and *Charles L. Hobson;* and for the National Association of Police Organizations et al. by *Stephen R. McSpadden.*

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *Tracey Maclin, Steven R. Shapiro, Harvey Grossman,* and *Barbara E. Bergman;* for the NAACP Legal Defense & Educational Fund, Inc., by *Elaine R. Jones, Theodore M. Shaw, George H. Kendall,* and *Laura E. Hankins;* and for the Rutherford Institute by *John W. Whitehead* and *Steven H. Aden.*

holding an opaque bag. Respondent looked in the direction of the officers and fled. Nolan and Harvey turned their car southbound, watched him as he ran through the gangway and an alley, and eventually cornered him on the street. Nolan then exited his car and stopped respondent. He immediately conducted a protective patdown search for weapons because in his experience it was common for there to be weapons in the near vicinity of narcotics transactions. During the frisk, Officer Nolan squeezed the bag respondent was carrying and felt a heavy, hard object similar to the shape of a gun. The officer then opened the bag and discovered a .38-caliber handgun with five live rounds of ammunition. The officers arrested Wardlow.

The Illinois trial court denied respondent's motion to suppress, finding the gun was recovered during a lawful stop and frisk. App. 14. Following a stipulated bench trial, Wardlow was convicted of unlawful use of a weapon by a felon. The Illinois Appellate Court reversed Wardlow's conviction, concluding that the gun should have been suppressed because Officer Nolan did not have reasonable suspicion sufficient to justify an investigative stop pursuant to *Terry* v. *Ohio*, 392 U. S. 1 (1968). 287 Ill. App. 3d 367, 678 N. E. 2d 65 (1997).

The Illinois Supreme Court agreed. 183 Ill. 2d 306, 701 N. E. 2d 484 (1998). While rejecting the Appellate Court's conclusion that Wardlow was not in a high crime area, the Illinois Supreme Court determined that sudden flight in such an area does not create a reasonable suspicion justifying a *Terry* stop. 183 Ill. 2d, at 310, 701 N. E. 2d, at 486. Relying on *Florida* v. *Royer*, 460 U. S. 491 (1983), the court explained that although police have the right to approach individuals and ask questions, the individual has no obligation to respond. The person may decline to answer and simply go on his or her way, and the refusal to respond, alone, does not provide a legitimate basis for an investigative stop. 183 Ill.

2d, at 311–312, 701 N. E. 2d, at 486–487. The court then determined that flight may simply be an exercise of this right to "go on one's way," and, thus, could not constitute reasonable suspicion justifying a *Terry* stop. 183 Ill. 2d, at 312, 701 N. E. 2d, at 487.

The Illinois Supreme Court also rejected the argument that flight combined with the fact that it occurred in a high crime area supported a finding of reasonable suspicion because the "high crime area" factor was not sufficient standing alone to justify a *Terry* stop. Finding no independently suspicious circumstances to support an investigatory detention, the court held that the stop and subsequent arrest violated the Fourth Amendment. We granted certiorari, 526 U. S. 1097 (1999), and now reverse.[1]

This case, involving a brief encounter between a citizen and a police officer on a public street, is governed by the analysis we first applied in *Terry*. In *Terry*, we held that an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot. 392 U. S., at 30. While "reasonable suspicion" is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop. *United States* v. *Sokolow*, 490 U. S. 1, 7 (1989). The officer must be able

---

[1] The state courts have differed on whether unprovoked flight is sufficient grounds to constitute reasonable suspicion. See, *e. g.*, *State* v. *Anderson*, 155 Wis. 2d 77, 454 N. W. 2d 763 (1990) (flight alone is sufficient); *Platt* v. *State*, 589 N. E. 2d 222 (Ind. 1992) (same); *Harris* v. *State*, 205 Ga. App. 813, 423 S. E. 2d 723 (1992) (flight in high crime area sufficient); *State* v. *Hicks*, 241 Neb. 357, 488 N. W. 2d 359 (1992) (flight is not enough); *State* v. *Tucker*, 136 N. J. 158, 642 A. 2d 401 (1994) (same); *People* v. *Shabaz*, 424 Mich. 42, 378 N. W. 2d 451 (1985) (same); *People* v. *Wilson*, 784 P. 2d 325 (Colo. 1989) (same).

to articulate more than an "inchoate and unparticularized suspicion or 'hunch'" of criminal activity. *Terry, supra,* at 27.[2]

Nolan and Harvey were among eight officers in a four-car caravan that was converging on an area known for heavy narcotics trafficking, and the officers anticipated encountering a large number of people in the area, including drug customers and individuals serving as lookouts. App. 8. It was in this context that Officer Nolan decided to investigate Wardlow after observing him flee. An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime. *Brown v. Texas,* 443 U. S. 47 (1979). But officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation. Accordingly, we have previously noted the fact that the stop occurred in a "high crime area" among the relevant contextual considerations in a *Terry* analysis. *Adams v. Williams,* 407 U. S. 143, 144, 147–148 (1972).

In this case, moreover, it was not merely respondent's presence in an area of heavy narcotics trafficking that aroused the officers' suspicion, but his unprovoked flight upon noticing the police. Our cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion. *United States v. Brignoni-Ponce,* 422 U. S. 873, 885 (1975); *Florida v. Rodriguez,* 469 U. S. 1, 6 (1984) *(per curiam); United States v. Sokolow, supra,* at 8–9. Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such. In reviewing the propriety of an officer's conduct, courts do not have available empirical studies dealing with inferences drawn from suspicious

---

[2] We granted certiorari solely on the question whether the initial stop was supported by reasonable suspicion. Therefore, we express no opinion as to the lawfulness of the frisk independently of the stop.

behavior, and we cannot reasonably demand scientific certainty from judges or law enforcement officers where none exists. Thus, the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior. See *United States* v. *Cortez*, 449 U. S. 411, 418 (1981). We conclude Officer Nolan was justified in suspecting that Wardlow was involved in criminal activity, and, therefore, in investigating further.

Such a holding is entirely consistent with our decision in *Florida* v. *Royer*, 460 U. S. 491 (1983), where we held that when an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business. *Id.*, at 498. And any "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." *Florida* v. *Bostick*, 501 U. S. 429, 437 (1991). But unprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not "going about one's business"; in fact, it is just the opposite. Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning.

Respondent and *amici* also argue that there are innocent reasons for flight from police and that, therefore, flight is not necessarily indicative of ongoing criminal activity. This fact is undoubtedly true, but does not establish a violation of the Fourth Amendment. Even in *Terry*, the conduct justifying the stop was ambiguous and susceptible of an innocent explanation. The officer observed two individuals pacing back and forth in front of a store, peering into the window and periodically conferring. 392 U. S., at 5–6. All of this conduct was by itself lawful, but it also suggested that the individuals were casing the store for a planned robbery. *Terry* recognized that the officers could detain the individuals to resolve the ambiguity. *Id.*, at 30.

In allowing such detentions, *Terry* accepts the risk that officers may stop innocent people. Indeed, the Fourth Amendment accepts that risk in connection with more drastic police action; persons arrested and detained on probable cause to believe they have committed a crime may turn out to be innocent. The *Terry* stop is a far more minimal intrusion, simply allowing the officer to briefly investigate further. If the officer does not learn facts rising to the level of probable cause, the individual must be allowed to go on his way. But in this case the officers found respondent in possession of a handgun, and arrested him for violation of an Illinois firearms statute. No question of the propriety of the arrest itself is before us.

The judgment of the Supreme Court of Illinois is reversed, and the cause is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE SOUTER, JUSTICE GINSBURG, and JUSTICE BREYER join, concurring in part and dissenting in part.

The State of Illinois asks this Court to announce a "bright-line rule" authorizing the temporary detention of anyone who flees at the mere sight of a police officer. Brief for Petitioner 7–36. Respondent counters by asking us to adopt the opposite *per se* rule—that the fact that a person flees upon seeing the police can never, by itself, be sufficient to justify a temporary investigative stop of the kind authorized by *Terry* v. *Ohio*, 392 U. S. 1 (1968). Brief for Respondent 6–31.

The Court today wisely endorses neither *per se* rule. Instead, it rejects the proposition that "flight is . . . necessarily indicative of ongoing criminal activity," *ante*, at 125, adhering to the view that "[t]he concept of reasonable suspicion . . . is not readily, or even usefully, reduced to a neat set of legal rules," but must be determined by looking to "the

totality of the circumstances—the whole picture," *United States* v. *Sokolow*, 490 U. S. 1, 7–8 (1989) (internal quotation marks and citation omitted). Abiding by this framework, the Court concludes that "Officer Nolan was justified in suspecting that Wardlow was involved in criminal activity." *Ante*, at 125.

Although I agree with the Court's rejection of the *per se* rules proffered by the parties, unlike the Court, I am persuaded that in this case the brief testimony of the officer who seized respondent does not justify the conclusion that he had reasonable suspicion to make the stop. Before discussing the specific facts of this case, I shall comment on the parties' requests for a *per se* rule.

I

In *Terry* v. *Ohio*, we first recognized "that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest," 392 U. S., at 22, an authority permitting the officer to "stop and briefly detain a person for investigative purposes," *Sokolow*, 490 U. S., at 7. We approved as well "a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Terry*, 392 U. S., at 27. Cognizant that such police intrusion had never before received constitutional imprimatur on less than probable cause, *id.*, at 11–12, 20, we reflected upon the magnitude of the departure we were endorsing. "Even a limited search," we said, "constitutes a severe, though brief, intrusion upon cherished personal security, and it must be an annoying, frightening, and perhaps humiliating experience." *Id.*, at 24–25.[1]

---

[1] We added that a *Terry* frisk "is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and is not to be undertaken lightly." 392 U. S., at 17. The resent-

Accordingly, we recognized only a "narrowly drawn authority" that is "limited to that which is necessary for the discovery of weapons." *Id.*, at 27, 26. An officer conducting an investigatory stop, we further explained, must articulate "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States* v. *Cortez*, 449 U. S. 411, 417–418 (1981). That determination, we admonished, "becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances." *Terry*, 392 U. S., at 21. In undertaking that neutral scrutiny "based on all of the circumstances," a court relies on "certain commonsense conclusions about human behavior." *Cortez*, 449 U. S., at 418; see also *ante*, at 125. "[T]he relevant inquiry" concerning the inferences and conclusions a court draws "is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." *Sokolow*, 490 U. S., at 10.

The question in this case concerns "the degree of suspicion that attaches to" a person's flight—or, more precisely, what "commonsense conclusions" can be drawn respecting the motives behind that flight. A pedestrian may break into a run for a variety of reasons—to catch up with a friend a block or two away, to seek shelter from an impending storm, to arrive at a bus stop before the bus leaves, to get home in time for

---

ment engendered by that intrusion is aggravated, not mitigated, if the officer's entire justification for the stop is the belief that the individual is simply trying to avoid contact with the police or move from one place to another—as he or she has a right to do (and do rapidly). See *Chicago* v. *Morales*, 527 U. S. 41, 53 (1999) (plurality opinion) ("We have expressly identified this 'right to remove from one place to another according to inclination' as 'an attribute of personal liberty' protected by the Constitution" (citation omitted)); *Florida* v. *Bostick*, 501 U. S. 429, 437 (1991); *Florida* v. *Royer*, 460 U. S. 491, 497–498 (1983) (plurality opinion); *Terry*, 392 U. S., at 32–33 (Harlan, J., concurring); see also *ante*, at 125.

dinner, to resume jogging after a pause for rest, to avoid contact with a bore or a bully, or simply to answer the call of nature—any of which might coincide with the arrival of an officer in the vicinity. A pedestrian might also run because he or she has just sighted one or more police officers. In the latter instance, the State properly points out "that the fleeing person may be, *inter alia*, (1) an escapee from jail; (2) wanted on a warrant; (3) in possession of contraband, (i. e. drugs, weapons, stolen goods, etc.); or (4) someone who has just committed another type of crime." Brief for Petitioner 9, n. 4.[2] In short, there are unquestionably circumstances in which a person's flight is suspicious, and undeniably instances in which a person runs for entirely innocent reasons.[3]

Given the diversity and frequency of possible motivations for flight, it would be profoundly unwise to endorse either *per se* rule. The inference we can reasonably draw about the motivation for a person's flight, rather, will depend on a number of different circumstances. Factors such as the time of day, the number of people in the area, the character of the neighborhood, whether the officer was in uniform, the way the runner was dressed, the direction and speed of the

---

[2] If the fleeing person exercises his or her right to remain silent after being stopped, only in the third of the State's four hypothetical categories is the stop likely to lead to probable cause to make an arrest. And even in the third category, flight does not necessarily indicate that the officer is "dealing with an armed and dangerous individual." *Terry* v. *Ohio*, 392 U. S. 1, 27 (1968).

[3] Compare, *e. g.*, Proverbs 28:1 ("The wicked flee when no man pursueth: but the righteous are as bold as a lion") with Proverbs 22:3 ("A shrewd man sees trouble coming and lies low; the simple walk into it and pay the penalty").

I have rejected reliance on the former proverb in the past, because its "ivory-towered analysis of the real world" fails to account for the experiences of many citizens of this country, particularly those who are minorities. See *California* v. *Hodari D.*, 499 U. S. 621, 630, n. 4 (1991) (STEVENS, J., dissenting). That this pithy expression fails to capture the total reality of our world, however, does not mean it is inaccurate in all instances.

flight, and whether the person's behavior was otherwise unusual might be relevant in specific cases. This number of variables is surely sufficient to preclude either a bright-line rule that always justifies, or that never justifies, an investigative stop based on the sole fact that flight began after a police officer appeared nearby.[4]

Still, Illinois presses for a *per se* rule regarding "unprovoked flight upon seeing a clearly identifiable police officer." *Id.*, at 7. The phrase "upon seeing," as used by Illinois, apparently assumes that the flight is motivated by the presence of the police officer.[5] Illinois contends that unprovoked flight is "an extreme reaction," *id.*, at 8, because innocent people simply do not "flee at the mere sight of the police," *id.*, at 24. To be sure, Illinois concedes, an innocent person—even one distrustful of the police—might "avoid eye contact or even sneer at the sight of an officer," and that

---

[4] Of course, *Terry* itself recognized that sometimes behavior giving rise to reasonable suspicion is entirely innocent, but it accepted the risk that officers may stop innocent people. 392 U. S., at 30. And as the Court correctly observes, it is "undoubtedly true" that innocent explanations for flight exist, but they do not "establish a violation of the Fourth Amendment." *Ante,* at 125. It is equally true, however, that the innocent explanations make the single act of flight sufficiently ambiguous to preclude the adoption of a *per se* rule.

In *Terry*, furthermore, reasonable suspicion was supported by a concatenation of acts, each innocent when viewed in isolation, that when considered collectively amounted to extremely suspicious behavior. See 392 U. S., at 5–7, 22–23. Flight alone, however, is not at all like a "series of acts, each of them perhaps innocent in itself, but which taken together warran[t] further investigation." *Id.*, at 22. Nor is flight similar to evidence which in the aggregate provides "fact on fact and clue on clue afford[ing] a basis for the deductions and inferences," supporting reasonable suspicion. *United States* v. *Cortez,* 449 U. S. 411, 419 (1981).

[5] Nowhere in Illinois' briefs does it specify what it means by "unprovoked." At oral argument, Illinois explained that if officers precipitate a flight by threats of violence, that flight is "provoked." But if police officers in a patrol car—with lights flashing and siren sounding—descend upon an individual for the sole purpose of seeing if he or she will run, the ensuing flight is "unprovoked." Tr. of Oral Arg. 17–18, 20.

would not justify a *Terry* stop or any sort of *per se* inference. *Id.*, at 8–9. But, Illinois insists, unprovoked flight is altogether different. Such behavior is so "aberrant" and "abnormal" that a *per se* inference is justified. *Id.*, at 8–9, and n. 4.

Even assuming we know that a person runs because he sees the police, the inference to be drawn may still vary from case to case. Flight to escape police detection, we have said, may have an entirely innocent motivation:

> "[I]t is a matter of common knowledge that men who are entirely innocent do sometimes fly from the scene of a crime through fear of being apprehended as the guilty parties, or from an unwillingness to appear as witnesses. Nor is it true as an accepted axiom of criminal law that 'the wicked flee when no man pursueth, but the righteous are as bold as a lion.' Innocent men sometimes hesitate to confront a jury—not necessarily because they fear that the jury will not protect them, but because they do not wish their names to appear in connection with criminal acts, are humiliated at being obliged to incur the popular odium of an arrest and trial, or because they do not wish to be put to the annoyance or expense of defending themselves." *Alberty* v. *United States*, 162 U. S. 499, 511 (1896).

In addition to these concerns, a reasonable person may conclude that an officer's sudden appearance indicates nearby criminal activity. And where there is criminal activity there is also a substantial element of danger—either from the criminal or from a confrontation between the criminal and the police. These considerations can lead to an innocent and understandable desire to quit the vicinity with all speed.[6]

---

[6] Statistical studies of bystander victimization are rare. One study attributes this to incomplete recordkeeping and a lack of officially compiled data. See Sherman, Steele, Laufersweiler, Hooper, & Julian, Stray Bul-

Among some citizens, particularly minorities and those residing in high crime areas, there is also the possibility that the fleeing person is entirely innocent, but, with or without justification, believes that contact with the police can itself be dangerous, apart from any criminal activity associated with the officer's sudden presence.[7] For such a person,

lets and "Mushrooms": Random Shootings of Bystanders in Four Cities, 1977–1988, 5 J. of Quantitative Criminology 297, 303 (1989). Nonetheless, that study, culling data from newspaper reports in four large cities over an 11-year period, found "substantial increases in reported bystander killings and woundings in all four cities." *Id.*, at 306. From 1986 to 1988, for example, the study identified 250 people who were killed or wounded in bystander shootings in the four survey cities. *Id.*, at 306–311. Most significantly for the purposes of the present case, the study found that such incidents "rank at the top of public outrage." *Id.*, at 299. The saliency of this phenomenon, in turn, "violate[s] the routine assumptions" of day-to-day affairs, and, "[w]ith enough frequency . . . it shapes the conduct of daily life." *Ibid.*

[7] See Johnson, Americans' Views on Crime and Law Enforcement: Survey Findings, Nat. Institute of Justice J. 13 (Sept. 1997) (reporting study by the Joint Center for Political and Economic Studies in April 1996, which found that 43% of African-Americans consider "police brutality and harassment of African-Americans a serious problem" in their own community); President's Comm'n on Law Enforcement and Administration of Justice, Task Force Report: The Police 183–184 (1967) (documenting the belief, held by many minorities, that field interrogations are conducted "indiscriminately" and "in an abusive . . . manner," and labeling this phenomenon a "principal problem" causing "friction" between minorities and the police) (cited in *Terry*, 392 U. S., at 14, n. 11); see also Casimir, Minority Men: We Are Frisk Targets, N. Y. Daily News, Mar. 26, 1999, p. 34 (informal survey of 100 young black and Hispanic men living in New York City; 81 reported having been stopped and frisked by police at least once; none of the 81 stops resulted in arrests); Brief for NAACP Legal Defense & Educational Fund as *Amicus Curiae* 17–19 (reporting figures on disproportionate street stops of minority residents in Pittsburgh and Philadelphia, Pennsylvania, and St. Petersburg, Florida); U. S. Dept. of Justice, Bureau of Justice Statistics, S. Smith, Criminal Victimization and Perceptions of Community Safety in 12 Cities 25 (June 1998) (African-American residents in 12 cities are more than twice as likely to be dissatisfied with police practices than white residents in same community).

unprovoked flight is neither "aberrant" nor "abnormal."[8] Moreover, these concerns and fears are known to the police officers themselves,[9] and are validated by law enforcement investigations into their own practices.[10]   Accordingly, the

---

[8] See, *e. g.*, Kotlowitz, Hidden Casualties: Drug War's Emphasis on Law Enforcement Takes a Toll on Police, Wall Street Journal, Jan. 11, 1991, p. A2, col. 1 ("Black leaders complained that innocent people were picked up in the drug sweeps . . . .   Some teen-agers were so scared of the task force they ran even if they weren't selling drugs").

Many stops never lead to an arrest, which further exacerbates the perceptions of discrimination felt by racial minorities and people living in high crime areas.   See Goldberg, The Color of Suspicion, N. Y. Times Magazine, June 20, 1999, p. 85 (reporting that in 2-year period, New York City Police Department Street Crimes Unit made 45,000 stops, only 9,500, or 20%, of which resulted in arrest); Casimir, *supra* n. 7 (reporting that in 1997, New York City's Street Crimes Unit conducted 27,061 stop-and-frisks, only 4,647 of which, 17%, resulted in arrest).   Even if these data were race neutral, they would still indicate that society as a whole is paying a significant cost in infringement on liberty by these virtually random stops.   See also n. 1, *supra.*

[9] The Chief of the Washington, D. C., Metropolitan Police Department, for example, confirmed that "sizeable percentages of Americans today—especially Americans of color—still view policing in the United States to be discriminatory, if not by policy and definition, certainly in its day-to-day application."   P. Verniero, Attorney General of New Jersey, Interim Report of the State Police Review Team Regarding Allegations of Racial Profiling 46 (Apr. 20, 1999) (hereinafter Interim Report).   And a recent survey of 650 Los Angeles Police Department officers found that 25% felt that "'racial bias (prejudice) on the part of officers toward minority citizens currently exists and contributes to a negative interaction between police and the community.'"   Report of the Independent Comm'n on the Los Angeles Police Department 69 (1991); see also 5 United States Comm'n on Civil Rights, Racial and Ethnic Tensions in American Communities: Poverty, Inequality and Discrimination, The Los Angeles Report 26 (June 1999).

[10] New Jersey's Attorney General, in a recent investigation into allegations of racial profiling on the New Jersey Turnpike, concluded that "minority motorists have been treated differently [by New Jersey State Troopers] than non-minority motorists during the course of traffic stops on the New Jersey Turnpike."   "[T]he problem of disparate treatment is real—not imagined," declared the Attorney General.   Not surprisingly,

evidence supporting the reasonableness of these beliefs is too pervasive to be dismissed as random or rare, and too persuasive to be disparaged as inconclusive or insufficient.[11]   In

the report concluded that this disparate treatment "engender[s] feelings of fear, resentment, hostility, and mistrust by minority citizens."   See Interim Report 4, 7.   Recently, the United States Department of Justice, citing this very evidence, announced that it would appoint an outside monitor to oversee the actions of the New Jersey State Police and ensure that it enacts policy changes advocated by the Interim Report, and keeps records on racial statistics and traffic stops.   See Kocieniewski, U. S. Will Monitor New Jersey Police on Race Profiling, N. Y. Times, Dec. 23, 1999, p. A1, col. 6.

Likewise, the Massachusetts Attorney General investigated similar allegations of egregious police conduct toward minorities.   The report stated:

"We conclude that Boston police officers engaged in improper, and unconstitutional, conduct in the 1989–90 period with respect to stops and searches of minority individuals . . . .   Although we cannot say with precision how widespread this illegal conduct was, we believe that it was sufficiently common to justify changes in certain Department practices.   .

"Perhaps the most disturbing evidence was that the *scope* of a number of *Terry* searches went far beyond anything authorized by that case and indeed, beyond anything that we believe would be acceptable under the federal and state constitutions even where probable cause existed to conduct a full search incident to an arrest.   Forcing young men to lower their trousers, or otherwise searching inside their underwear, on public streets or in public hallways, is so demeaning and invasive of fundamental precepts of privacy that it can only be condemned in the strongest terms. The fact that not only the young men themselves, but independent witnesses complained of strip searches, should be deeply alarming to all members of this community."   J. Shannon, Attorney General of Massachusetts, Report of the Attorney General's Civil Rights Division on Boston Police Department Practices 60–61 (Dec. 18, 1990).

[11] Taking into account these and other innocent motivations for unprovoked flight leads me to reject Illinois' requested *per se* rule in favor of adhering to a totality-of-the-circumstances test.   This conclusion does not, as Illinois suggests, "establish a separate *Terry* analysis based on the individual characteristics of the person seized."   Reply Brief for Petitioner 14.   My rejection of a *per se* rule, of course, applies to members of all races.

It is true, as Illinois points out, that *Terry* approved of the stop and frisk procedure notwithstanding "[t]he wholesale harassment by certain

any event, just as we do not require "scientific certainty" for our commonsense conclusion that unprovoked flight can sometimes indicate suspicious motives, see *ante*, at 124–125, neither do we require scientific certainty to conclude that unprovoked flight can occur for other, innocent reasons.[12]

The probative force of the inferences to be drawn from flight is a function of the varied circumstances in which it occurs. Sometimes those inferences are entirely consistent with the presumption of innocence, sometimes they justify further investigation, and sometimes they justify an immediate stop and search for weapons. These considerations have led us to avoid categorical rules concerning a person's flight and the presumptions to be drawn therefrom:

> "Few things . . . distinguish an enlightened system of judicature from a rude and barbarous one more than the manner in which they deal with evidence. The former weighs testimony, whilst the latter, conscious perhaps of its inability to do so or careless of the consequences of error, at times rejects whole portions *en masse*, and at others converts pieces of evidence into rules of law by investing with conclusive effect some whose probative force has been found to be in general considerable. . . . Our ancestors, observing that guilty persons usually fled from justice, adopted the hasty conclusion that it was only the guilty who did so . . . so that under the old law, a man who fled to avoid being tried for felony forfeited

elements of the police community, of which minority groups, particularly Negroes, frequently complain." 392 U. S., at 14. But in this passage, *Terry* simply held that such concerns would not preclude the use of the stop and frisk procedure altogether. See *id.*, at 17, n. 14. Nowhere did *Terry* suggest that such concerns cannot inform a court's assessment of whether reasonable suspicion sufficient to justify a particular stop existed.

[12] As a general matter, local courts often have a keener and more informed sense of local police practices and events that may heighten these concerns at particular times or locations. Thus, a reviewing court may accord substantial deference to a local court's determination that fear of the police is especially acute in a specific location or at a particular time.

all his goods even though he were acquitted . . . . In modern times more correct views have prevailed, and the evasion of or flight from justice seems now nearly reduced to its true place in the administration of the criminal law, namely, that of a circumstance—a fact which it is always of importance to take into consideration, and combined with others may afford strong evidence of guilt, but which, like any other piece of presumptive evidence, it is equally absurd and dangerous to invest with infallibility." *Hickory* v. *United States*, 160 U. S. 408, 419–420 (1896) (internal quotation marks omitted).

"Unprovoked flight," in short, describes a category of activity too broad and varied to permit a *per se* reasonable inference regarding the motivation for the activity. While the innocent explanations surely do not establish that the Fourth Amendment is always violated whenever someone is stopped solely on the basis of an unprovoked flight, neither do the suspicious motivations establish that the Fourth Amendment is never violated when a *Terry* stop is predicated on that fact alone. For these reasons, the Court is surely correct in refusing to embrace either *per se* rule advocated by the parties. The totality of the circumstances, as always, must dictate the result.[13]

---

[13] Illinois' reliance on the common law as a conclusive answer to the issue at hand is mistaken. The sources from which it gleans guidance focus either on flight *following* an accusation of criminal activity, see 4 W. Blackstone, Commentaries *387 ("For *flight* . . . *on an accusation* of treason, felony, or even petit larceny . . . is an offence carrying with it a strong presumption of guilt" (emphasis added in part)), or are less dogmatic than Illinois contends, compare Brief for Petitioner 15 ("[A] person's flight was considered . . . conclusive proof of guilt") with A. Burrill, Circumstantial Evidence 472 (1856) ("So impressed was the old common law with considerations of this kind, that it laid down the rule, which passed into a maxim,—that flight from justice was equivalent to confession of guilt . . . . But this maxim . . . was undoubtedly expressed in too general and sweeping terms").

## II

Guided by that totality-of-the-circumstances test, the Court concludes that Officer Nolan had reasonable suspicion to stop respondent. *Ante*, at 125. In this respect, my view differs from the Court's. The entire justification for the stop is articulated in the brief testimony of Officer Nolan. Some facts are perfectly clear; others are not. This factual insufficiency leads me to conclude that the Court's judgment is mistaken.

Respondent Wardlow was arrested a few minutes after noon on September 9, 1995. 183 Ill. 2d 306, 308, n. 1, 701 N. E. 2d 484, 485, n. 1 (1998).[14] Nolan was part of an eight-officer, four-car caravan patrol team. The officers were headed for "one of the areas in the 11th District [of Chicago] that's high [in] narcotics traffic." App. 8.[15] The reason why four cars were in the caravan was that "[n]ormally in these different areas there's an enormous amount of people, sometimes lookouts, customers." *Ibid.* Officer Nolan testified that he was in uniform on that day, but he did not recall whether he was driving a marked or an unmarked car. *Id.*, at 4.

Officer Nolan and his partner were in the last of the four patrol cars that "were all caravaning eastbound down Van Buren." *Id.*, at 8. Nolan first observed respondent "in front of 4035 West Van Buren." *Id.*, at 7. Wardlow "looked in our direction and began fleeing." *Id.*, at 9. Nolan then "began driving southbound down the street observing [respondent] running through the gangway and the alley southbound," and observed that Wardlow was carrying a white,

---

[14] At the suppression hearing, the State failed to present testimony as to the time of respondent's arrest. The Illinois Supreme Court, however, took notice of the time recorded in Officer Nolan's arrest report. See 183 Ill. 2d, at 308, n. 1, 701 N. E. 2d, at 485, n. 1.

[15] The population of the 11th district is over 98,000 people. See Brief for the National Association of Police Organizations et al. as *Amici Curiae* App. II.

opaque bag under his arm. *Id.*, at 6, 9. After the car turned south and intercepted respondent as he "ran right towards us," Officer Nolan stopped him and conducted a "protective search," which revealed that the bag under respondent's arm contained a loaded handgun. *Id.*, at 9–11.

This terse testimony is most noticeable for what it fails to reveal. Though asked whether he was in a marked or unmarked car, Officer Nolan could not recall the answer. *Id.*, at 4. He was not asked whether any of the other three cars in the caravan were marked, or whether any of the other seven officers were in uniform. Though he explained that the size of the caravan was because "[n]ormally in these different areas there's an enormous amount of people, sometimes lookouts, customers," Officer Nolan did not testify as to whether *anyone* besides Wardlow was nearby 4035 West Van Buren. Nor is it clear that that address was the intended destination of the caravan. As the Appellate Court of Illinois interpreted the record, "it appears that the officers were simply driving by, on their way to some unidentified location, when they noticed defendant standing at 4035 West Van Buren." 287 Ill. App. 3d 367, 370–371, 678 N. E. 2d 65, 67 (1997).[16] Officer Nolan's testimony also does not reveal how fast the officers were driving. It does not indicate whether he saw respondent notice the other patrol cars. And it does not say whether the caravan, or any part of it, had already passed Wardlow by before he began to run.

Indeed, the Appellate Court thought the record was even "too vague to support the inference that . . . defendant's flight was related to his expectation of police focus on him." *Id.*, at 371, 678 N. E. 2d, at 67. Presumably, respondent did not react to the first three cars, and we cannot even be sure that he recognized the occupants of the fourth as police officers. The adverse inference is based entirely on the officer's

---

[16] Of course, it would be a different case if the officers had credible information respecting that specific street address which reasonably led them to believe that criminal activity was afoot in that narrowly defined area.

statement: "He looked in our direction and began fleeing."
App. 9.[17]

No other factors sufficiently support a finding of reasonable suspicion. Though respondent was carrying a white, opaque bag under his arm, there is nothing at all suspicious about that. Certainly the time of day—shortly after noon—does not support Illinois' argument. Nor were the officers "responding to any call or report of suspicious activity in the area." 183 Ill. 2d, at 315, 701 N. E. 2d, at 488. Officer Nolan did testify that he expected to find "an enormous amount of people," including drug customers or lookouts, App. 8, and the Court points out that "[i]t was in this context that Officer Nolan decided to investigate Wardlow after observing him flee," ante, at 124. This observation, in my view, lends insufficient weight to the reasonable suspicion analysis; indeed, in light of the absence of testimony that anyone else was nearby when respondent began to run, this observation points in the opposite direction.

The State, along with the majority of the Court, relies as well on the assumption that this flight occurred in a high crime area. Even if that assumption is accurate, it is insufficient because even in a high crime neighborhood unprovoked flight does not invariably lead to reasonable suspicion. On the contrary, because many factors providing innocent motivations for unprovoked flight are concentrated in high crime areas, the character of the neighborhood arguably makes an inference of guilt less appropriate, rather than more so. Like unprovoked flight itself, presence .in a high crime neighborhood is a fact too generic and susceptible to innocent explanation to satisfy the reasonable suspicion inquiry. See *Brown* v. *Texas,* 443 U. S. 47, 52 (1979); see also n. 15, *supra.*

---

[17] Officer Nolan also testified that respondent "was looking *at* us," App. 5 (emphasis added), though this minor clarification hardly seems sufficient to support the adverse inference.

It is the State's burden to articulate facts sufficient to support reasonable suspicion.  *Brown* v. *Texas*, 443 U. S., at 52; see also *Florida* v. *Royer*, 460 U. S. 491, 500 (1983) (plurality opinion).  In my judgment, Illinois has failed to discharge that burden.  I am not persuaded that the mere fact that someone standing on a sidewalk looked in the direction of a passing car before starting to run is sufficient to justify a forcible stop and frisk.

I therefore respectfully dissent from the Court's judgment to reverse the court below.