ALTENBERND, Judge,
Concurring.
Although I cannot refute the logic of our decision today, experience suggests to me that the United States Supreme Court did not envision the circumstances of this case when it decided Illinois v. Wardlow, 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). The Wardlow decision, when mixed with the content of section 843.02, Florida Statutes (2007), and the inclinations of the typical teenage mind, creates a recipe for police tactics that can only exacerbate racial and socio-economic tensions in the communities of this state.
When the deputy sheriffs first saw C.E.L., they had no basis to arrest this juvenile or even to conduct a Terry[3] stop. This sixteen-year-old African-American male was standing with one other teenager in the public area of an apartment complex. The apartment complex is in a neighborhood immediately northwest of University Square Mall. The neighborhood is sometimes referred to as “suitcase city” and is locally regarded by law enforcement as a “high-crime neighborhood.” This teenager fives with his mother about a mile from where he was arrested. In other words, he was in a “high-crime neighborhood” because it is his home.
The two deputies involved in this arrest arrived at the apartment complex at 8:50 p.m. They got out of their car wearing vests emblazoned with “Sheriffs Office.” When the two teenagers saw the deputies, the teenagers ran. Under Wardlow, because of the nature of the neighborhood in which these teenagers five, their decision to run created a reasonable suspicion of criminal activity sufficient to justify a Terry stop. Thus, the deputies were legally authorized to order the two teenagers to *564 stop. Because the teenagers did not stop running when ordered to do so, this court now concludes that the teenagers committed the misdemeanor of resisting an officer without violence under section 843.02. In the span of a few seconds and perhaps seventy-five feet, the teenagers were transformed from free persons protected by the Fourth Amendment into misde-meanants subject to arrest.
If these teenagers lived on Bayshore Boulevard in Tampa, or in Carrollwood or Temple Terrace, they would have been free to run when they saw the deputies. Running would not have created a basis for a Terry stop or the foundation for a misdemeanor. But these teenagers are poor and live in a “high-crime neighborhood.” There are no signs telling these teenagers that the neighborhood is a region with reduced Fourth Amendment rights. This neighborhood is classified as a “high-crime neighborhood” not by some objective statistical measurement, but by the subjective testimony of individual law enforcement officers. It is probably noteworthy that both court facilities of the Second District may qualify as locations within high-crime neighborhoods, but there is no official government location where one can determine that status. It is likely that almost all judges in Florida live in neighborhoods unaffected by this court’s holding today.
The fact that this case involves juveniles is significant to me. It is arguably suspicious if a thirty-five-year-old woman decides to run when she sees a police officer at 8:50 p.m. in her neighborhood. It is another matter when the runner is a juvenile, especially a juvenile from an ethnic minority in a neighborhood that is poor. The simple truth is that any good police officer with a year’s experience can conduct herself in a manner that causes many typical teenagers to run under these circumstances. The experienced officer can order a teenager to stop in a manner that will not convince many teenagers to stop. In other words, a well-trained law enforcement officer has the ability to arrest many teenagers almost at will during the evening hours in a bad neighborhood.
From a legal perspective, it may be of no consequence that the officers had no basis to detain these teenagers until they ran, but I fear there are consequences for our communities if we allow the sale of drugs in poor and ethnic minority neighborhoods to transform those neighborhoods into “high-crime neighborhoods” where the Bill of Rights means something less than what the original framers intended it to mean for all free people.
Finally, I would note that the court’s opinion does not express direct conflict with Judge Shevin’s decision for the Third District in D.T.B. v. State, 892 So.2d 522 (Fla. 3d DCA 2004), but there does appear to be such express and direct conflict.