QUINCE, C.J.,
dissenting.
While the result reached by the majority seems to be in keeping with a literal reading of the statute, I cannot agree because of the societal implications of such a literal reading. I acknowledge that the United States Supreme Court in Illinois v. Wardlow, 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000), held that flight from the police in a high crime area gives the police the requisite reasonable suspicion to temporarily stop and detain a person who is fleeing. I also acknowledge that section 843.02, Florida Statutes (2007), seems to allow the police to charge a person with resisting an officer without violence when he or she continues to flee from the police after an order to stop. However, I cannot believe that we as a society have come to the point where we are willing to make criminals of people, especially our young people, based on where they live.
In the Wardlow opinion the Supreme Court gave the police the authority to stop a fleeing citizen, not necessarily a fleeing suspect, if that flight from the poliee takes place in a “high crime area.” If an individual such as C.E.L. or you or I lives in an area that has not been designated by the police as a “high crime area,” that person could run with impunity at the sight of the police, even if he was in fact in the process of committing a crime as long as the police have no reason to believe he was about to commit a crime. Yet given the same set of facts, persons living in a high crime area, including juveniles who have no choice but to live where their parents have a home, become criminals if they run upon the sight of a police officer. "What has become of such concepts as equal protection, innocent until proven guilty, and due process? Like the Third District Court of Appeal in D.T.B. v. State, 892 So.2d 522 (Fla. 3d DCA 2004), I do not believe this is the scenario and end result envisioned by the Wardlow court.
The unintended consequences of criminalizing otherwise innocent conduct and people are clearly illustrated in the D.T.B. case. In that case the police wanted to conduct what is termed a “voluntary field interview” with D.T.B. The police acknowledged that these types of interviews are consensual encounters between the police and a citizen, i.e., an encounter where the citizen is free to refuse to speak to the police and can leave at any time. They also acknowledged that D.T.B. was merely standing by a tree, albeit the police had observed drug transactions by that tree in the past. However, on this occasion the police did not observe any drug transactions, and they did not suspect D.T.B. of being involved in any criminal activity. When the officers pulled up to the area, D.T.B. ran away. The police ordered D.T.B. to stop, he continued to run, and the police caught and arrested him. What happened to the consent portion of the consensual encounter that the police acknowledged was their reason for approaching D.T.B.?
From the facts of the case, it appears that nothing was found on D.T.B. and *1197 there was no development of any facts that led the police to believe that any crime had been or was about to be committed. Yet D.T.B. was charged with and adjudicated for obstructing/resisting an officer based solely on the fact that he ran when he saw the police. Except for the fact that the Third District reversed D.T.B.’s adjudication of delinquency, this young person, who had done nothing more than run from the sight of the police,[13] would have a criminal record.
The Third District made its determination that D.T.B. should not have been adjudicated for resisting or obstructing an officer on two factors. First, the court said that Wardlow did not criminalize running from the police. Instead, the Third District reasoned, the Wardlow court simply gave the police another investigative tool and the ability to detain a person for a brief Terry-type investigation when that person runs at the sight of the police. If the police gain no additional information which would lead to probable cause, then the person should be free to go. Second, the Third District opined that the police had no reasonable suspicion that D.T.B. was engaged in any criminal activity. In fact, the police said just the opposite. Thus, the district court found that the officers were not executing any legal duty at the time the juvenile D.T.B. fled. Additionally, the Third District cited a number of other district court cases, decided prior to Wardlow, which held that flight alone was insufficient to demonstrate resisting/obstruction. See, e.g., DM. v. State, 681 So.2d 797 (Fla. 2d DCA 1996) (holding that passenger of stopped car who fled from police was not guilty of obstruction without violence); S.G.K. v. State, 657 So.2d 1246 (Fla. 1st DCA 1995) (concluding that juvenile’s presence at scene of automobile accident followed by flight when police approached was insufficient to justify finding juvenile resisted arrest without violence); F.B. v. State, 605 So.2d 578 (Fla. 3d DCA 1992) (holding that juvenile’s flight from the scene of an automobile theft when ordered by police officers to stop was insufficient to support resisting arrest without violence).
Under the majority’s reasoning in this case, the fact that the police said “Stop” turns what was otherwise the free exercise of a citizen’s right to not have an encounter with the police into a misdemeanor of the first degree, which carries with it a punishment of up to one year in prison. I do not believe that the Wardlow court contemplated such a draconian result.
I am especially concerned because many of the cases we see, like the case before us, involve juveniles, our young people who are our future leaders and voters and workers. I simply cannot condone actions that could result in a large number of young people having criminal records, records that will follow them into the future, because they were uncomfortable with the possibility of having an encounter with the police. I can understand to some extent the police charging a person with obstruction/resisting if in fact the detention that is authorized under Wardlow ripens into something beyond the reasonable suspicion caused by the flight. However, I cannot understand making criminal that which any other citizen would be allowed to do but for the fact that this person lives in a particular neighborhood. I agree with the following statements from Judge Alten- *1198 bernd’s concurring opinion in C.E.L., 995 So.2d 558:
The fact that this case involves juveniles is significant to me. It is arguably suspicious if a thirty-five-year-old woman decides to run when she sees a police officer at 8:50 p.m. in her neighborhood. It is another matter when the runner is a juvenile, especially a juvenile from an ethnic minority in a neighborhood that is poor. The simple truth is that any good police officer with a year’s experience can conduct herself in a manner that causes many typical teenagers to run under these circumstances. The experienced officer can order a teenager to stop in a manner that will not convince many teenagers to stop. In other words, a well-trained law enforcement officer has the ability to arrest many teenagers almost at will during the evening hours in a bad neighborhood.
... I fear there are consequences for our communities if we allow the sale of drugs in poor and ethnic neighborhoods to transform those neighborhoods into “high-crime neighborhoods” where the Bill of Rights means something less than what the original framers intended it to mean for all free people.
Id. at 564 (Altenbernd, J., concurring). And even in situations that involve adults, I have some cause for concern because many adults in these neighborhoods have had less than pleasant encounters with the police.
I urge the Legislature to address this very troubling and dangerous matter. This can be done by making clear that resisting or obstructing an officer must be based on factors other than mere flight from police. We simply cannot allow a generation of young people to be further victimized because of their often justifiable distrust of law enforcement and because they are unfortunate enough to live in a so-called “high-crime neighborhood.”

. We have only to look at any information concerning the relationship of the police with citizens who live in these so-called “high crime areas” to know that the residents of many of these areas are poor or minority or both and that they have a distrust of the police. Often this distrust is based on their personal encounters with the police or their observations of police actions and conduct that may not have even involved them.