# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-KA-00539-COA

**BRYMON HAMP, JR. A/K/A BRYMON SHIELD HAMP, JR. A/K/A BOOJACK A/K/A BRYMON HAMP A/K/A BRYMON A. HAMP A/K/A BRYMON S. HAMP A/K/A BRYMON SHILED HAMP A/K/A BRYMON SHIELD HAMP**    APPELLANT

v.

**STATE OF MISSISSIPPI**    APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 01/23/2014 |
| TRIAL JUDGE: | HON. CHARLES E. WEBSTER |
| COURT FROM WHICH APPEALED: | COAHOMA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: R. STEWART SMITH JR. |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: BARBARA WAKELAND BYRD |
| DISTRICT ATTORNEY: | BRENDA FAY MITCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF COUNT I, CAPITAL MURDER, AND SENTENCED AS A HABITUAL OFFENDER TO LIFE; AND COUNT II, FELONY FLEEING, AND SENTENCED AS A HABITUAL OFFENDER TO FIVE YEARS, TO RUN CONSECUTIVELY TO THE SENTENCE IN COUNT I, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITHOUT ELIGIBILITY FOR PAROLE OR PROBATION |
| DISPOSITION: | AFFIRMED - 12/13/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE LEE, C.J., JAMES AND GREENLEE, JJ.**

**LEE, C.J., FOR THE COURT:**

¶1.     In this appeal, we must decide whether the Circuit Court of Coahoma County erred in denying Brymon Hamp Jr.'s motion to suppress.

## FACTS AND PROCEDURAL HISTORY

¶2.     On July 29, 2010, a concerned citizen reported that something had happened to Gerald Simmons at his nearby liquor store in Friars Point, Mississippi. The chief of police of Friars Point, Tracy Vance, went to the store and found the door open, Simmons lying on the floor semi-conscious and with gashes to his head, and blood spatter throughout the store. The cash register was open, and no bills were in the cash-register drawer. Shortly thereafter, Simmons was transported to the hospital.

¶3.     While Chief Vance was at Simmons's store, he received a phone call from an anonymous caller. The caller stated Jerry Carr and another person "supposed to been hit [sic] Simmons," and they were driving a "black box Chevy." Chief Vance relayed this information to the Coahoma County dispatcher and Investigator Neal Mitchell with the Coahoma County Sheriff's Department.

¶4.     Investigator Mitchell went to the hospital, where he attempted to interview Simmons, who was in and out of consciousness. According to Investigator Mitchell, Simmons's son was present during the interview and suggested that two individuals assaulted Simmons. Then Simmons, during a moment of consciousness, stated that possibly two young, black males had assaulted him.

¶5.     Investigator Herbert Thomas was at the hospital while Investigator Mitchell interviewed Simmons. Investigator Thomas also received a phone call from an anonymous

caller. According to Investigator Thomas, the caller stated: "The people y'all are looking for [are] BooJack, Bootchie[,] and Yount. They're going to be in a black faded box Chevy headed toward . . . Clarksdale." Investigator Thomas knew Bootchie and Yount were nicknames for Carr and Tyonda Tenner, respectively. At the time, Investigator Thomas did not know that BooJack was Hamp's nickname. Investigator Thomas relayed the information to Sergeant Oliver Mitchell. And a be-on-the-lookout ("BOLO") was issued.

¶6. Deputy Dewayne Harvey with the Coahoma County Sheriff's Department spotted a vehicle matching the description in the BOLO, with Carr in the passenger seat and another person driving. Deputy Harvey intended to stop the vehicle as soon as it reached a more populated area. As Deputy Harvey began following the vehicle, the driver—later determined to be Hamp—increased speed. Deputy Harvey testified that the vehicle "got up to a high rate of speed[,] . . . maybe 60, 65 [miles per hour,]" before he turned his blue lights on. At that point, Deputy Harvey turned on his blue lights and attempted to pull the vehicle over. A pursuit ensued, which lasted approximately ten minutes. According to Deputy Harvey, the vehicle reached speeds as high as 85 miles per hour on a two-lane road. However, Deputy Harvey did not have a radar in his vehicle. The vehicle also ran several stop signs and nearly collided with another vehicle. After Deputy Harvey called for backup, the vehicle was eventually pulled over. The officers detained Hamp and Carr and recovered $304 from Hamp and $282 from Carr. Investigator Thomas noticed a blood stain on Hamp's shoe, so Hamp's shoes and later his clothes were seized. In the vehicle, a bottle of vodka was on the front seat and a case of gin was on the back seat.

¶7.    Hamp filed a pretrial motion to exclude the physical evidence that was obtained as a result of the investigatory stop on July 29. Defense counsel argued that the investigatory stop was based on information from anonymous informants, that the tips bore no indicia of reliability, and that the officers did not investigate the veracity of the information. After a hearing on the motion, the trial court found that the circumstances surrounding the investigatory stop did not warrant suppression of the items that were seized.

¶8.    At trial, Dr. Feng Li testified that Simmons died on August 6, 2010. According to Dr. Li, Simmons's death was caused by blunt force trauma to the head, and the manner of death was homicide. The items seized during the investigatory stop were then introduced into evidence. Expert testimony established that Hamp's shoe and shorts tested positive for blood, and the blood samples matched Simmons's DNA profile.

¶9.    Tenner testified that Hamp lived in her apartment, and as part of their living arrangement, Hamp was responsible for paying the gas bill. Tenner testified that, on July 29, Hamp promised that he would get the money to pay the bill. Later that afternoon, Hamp and Carr returned with $900 and a case of gin. Hamp gave Tenner $300 for the gas bill. And Hamp stated that he and Carr hit Simmons in the back of the head with a gun and robbed his liquor store.

¶10.   Hamp was convicted of Count I, capital murder, and Count II, felony fleeing. Hamp was sentenced as a habitual offender to life for Count I and five years for Count II, to run consecutively to the sentence in Count I, without the possibility of parole or probation, all in the custody of the Mississippi Department of Corrections. Hamp filed a motion for a new

4

trial or, in the alternative, a judgment notwithstanding the verdict, which was denied. Hamp appeals.

## STANDARD OF REVIEW

¶11.    A mixed standard of review is applied to Fourth Amendment suppression-of-evidence inquiries. *Cooper v. State*, 145 So. 3d 1219, 1224 (¶15) (Miss. Ct. App. 2013).

> Determinations of reasonable suspicion and probable cause should be reviewed de novo. However, this Court is restricted to a de novo review of the trial judge's decision based on historical facts reviewed under the substantial evidence and clearly erroneous standards. Further, the Court reviews a trial court's decision to admit or exclude evidence following a motion to suppress under the abuse-of-discretion standard.

*Id*. (internal quotations and citations omitted).

## DISCUSSION

¶12.    The Fourth Amendment to the United States Constitution and Article 3, Section 23 of the Mississippi Constitution protect individuals from unreasonable searches and seizures. U.S. Const. amend. IV; Miss. Const. art. 3, § 23.

¶13.    The Mississippi Supreme Court has held that "*before* conducting an investigatory, or *Terry*[1] stop, officers are required to have 'reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in a felony or some objective manifestation that the person stopped is[,] or is about to be[,] engaged in criminal activity.'" *Cooper v. State*, 145 So. 3d 1164, 1168 (¶11) (Miss. 2014) (emphasis in original) (quoting *Williamson v. State*, 876 So. 2d 353, 355 (¶12) (Miss. 2004)). "Reasonable suspicion can arise from an officer's personal observations, a tip by a trusted police informant, or by

---

[1] *Terry v. Ohio*, 392 U.S. 1 (1968).

5

anonymous tip." *Id.* (citing *Florida v. J.L.*, 529 U.S. 266, 270-71 (2000)). But information by anonymous tip must have some indication that it is reliable. *Id.*

¶14. The United States Supreme Court has previously stated that "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity." *Id.* at (¶12) (quoting *Alabama v. White*, 496 U.S. 325, 328-29 (1990)). However, the United States Supreme Court has also stated that "there are situations in which an anonymous tip *suitably corroborated*, exhibits sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." *Id.* (emphasis in orginal) (quoting *J.L.*, 529 U.S. at 270). "Reasonable suspicion is dependent upon the content of the information possessed by the detaining officer as well as its degree of reliability. Both factors—quantity and quality—are considered in the 'totality of the circumstances.'" *Williamson*, 876 So. 2d at 355 (¶11) (quoting *Floyd v. State*, 749 So. 2d 110, 118 (¶30) (Miss. 1999)).

¶15. Hamp cites to *J.L.* for support. In *J.L.*, law enforcement received a tip that a "young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." *J.L.*, 529 U.S. at 268. Upon arriving at the bus stop, officers observed three black males, and one—J.L.—was wearing a plaid shirt. *Id.* The officers frisked J.L. and recovered a gun. *Id.* In determining that the officers did not have reasonable suspicion to make the initial stop, the United States Supreme Court stated: "All the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L." *Id.* at 271.

¶16. In contrast, in *White*, 496 U.S. at 327, the police received an anonymous tip that a

6

specific individual would be traveling in a vehicle matching a specific description and heading to a specific location. And that the individual possessed cocaine. *Id*. After corroborating certain details, the police officer stopped the vehicle and discovered the cocaine. *Id.* at 331. The United States Supreme Court noted that the tip accurately described the future behavior of the specific individual, thereby demonstrating "a special familiarity with [the] respondent's affairs," implying that the tipster "had access to reliable information about that individual's illegal activities." *Id*. at 332.

¶17.    Here, the tips received stated that certain named individuals would be traveling in a specific car heading to a particular location. And that these individuals were involved in the robbery. Deputy Harvey was patrolling an area where he thought he might see the car in question. When Deputy Harvey saw the car matching the description in the BOLO, he noticed Carr in the passenger seat. And Deputy Harvey testified that he was familiar with Carr. Considering the totality of the circumstances, we find that the tips demonstrated the tipsters' reliability and basis of knowledge to support a finding of reasonable suspicion before Deputy Harvey stopped Hamp.

¶18.    When a crime has been committed, the supreme court has acknowledged that a police officer has a duty to seek out those who commit reported crimes and investigate complaints made of purported illegal activity. *Dies v. State*, 926 So. 2d 910, 919 (¶24) (Miss. 2006) (citation omitted). "The Fourth Amendment does not require police who lack the information necessary for probable cause to simply shrug their shoulders and allow a crime or a criminal escape to occur. Rather, it allows for investigatory stops to encourage the

7

police to pursue their reasonable suspicions." *Id.* (citation omitted).

¶19.    We further find that Hamp's flight gave rise to reasonable suspicion sufficient for Deputy Harvey to follow in pursuit. *See Cooper*, 145 So. 3d at 1172 (¶29). "[H]eadlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Id.* (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)). "Furthermore, nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Id.* at 1172-73 (¶29).

¶20.    **THE JUDGMENT OF THE CIRCUIT COURT OF COAHOMA COUNTY OF CONVICTION OF COUNT I, CAPITAL MURDER, AND SENTENCE AS A HABITUAL OFFENDER OF LIFE; AND COUNT II, FELONY FLEEING, AND SENTENCE AS A HABITUAL OFFENDER OF FIVE YEARS, WITH THE SENTENCE TO RUN CONSECUTIVELY TO THE SENTENCE IN COUNT I, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITHOUT ELIGIBILITY FOR PAROLE OR PROBATION, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO COAHOMA COUNTY.**

**GRIFFIS, P.J., ISHEE, CARLTON, FAIR, JAMES AND GREENLEE, JJ., CONCUR. IRVING, P.J., BARNES AND WILSON, JJ., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**