OPINION
This case is before us on the Crim. R. 12(J) appeal of the State of Ohio from a decision granting a motion to suppress filed by Defendant, Michael Kimble. The State presents the following single assignment of error:
I. Because unprovoked flight in a high crime area is sufficient to support a reasonable, particularized suspicion under Terry, the trial court erred in suppressing the State of Ohio's evidence.
After considering the record and the assignment of error, we find that the assignment of error has merit. Accordingly, the trial court's decision on suppression will be reversed and this case will be remanded for further proceedings.
The transcript of the suppression hearing reveals the following facts. On June 25, 2000, at about 7:00 p.m., Dayton Police Officer, James Mullins, was dispatched to 715 Oxford Avenue on a 911 disconnect call. Mullins responded to the call, but waited about ten minutes for a backup officer to arrive. Mullins thus arrived at about 7:10 p.m., and parked just past 715, in front of 711 Oxford. 715 Oxford was a single home, and the house next door was a double, numbered 713 and 711. The homes in that location are quite close together. When Mullins pulled up, he saw two people on the porch of 711 Oxford. One person immediately ran off the porch to the east, and went between the houses. The other person began walking casually toward 715 Oxford.
According to Mullins, the neighborhood in the area of 715 Oxford is known for drugs, weapons, and prostitution. Mullins, himself, had made seven or eight drug or weapons arrests in that area in the past three years, and knew of 15-20 similar arrests by other officers. When Mullins arrived, he did not see anything illegal being done by the two people on the porch, nor did he have any indication that they were connected with the 911 call, other than their proximity to the house. However, Mullins followed the person who ran away to see if he had something to do with the call.
Mullins went down a few yards and ran into Kimble, who was walking out from behind a garage at 701 Oxford. At that time, Mullins ordered Kimble to get down on the ground, but Kimble refused. Kimble did not threaten Mullins, did not act aggressively, and did not make any gestures as if to pull a weapon. However, as a result of Kimble's refusal to get on the ground, Mullins tackled Kimble, took him to the ground, and handcuffed his hands behind his back. Mullins then walked Kimble back to the cruiser. At this time, Kimble told Mullins that he ran away because he was afraid.
When Kimble and Mullins arrived at the cruiser, Mullins and his back-up officer (Wendy Stiver) both conducted a "pat-down" search for safety. During the pat-down, Stiver felt a chunky hard substance wrapped in plastic that she believed was cocaine. Stiver then reached in Kimble's pocket and pulled out the packet. Subsequently, Kimble was arrested and charged with possession of cocaine.
After hearing the above evidence, the trial court granted the motion to suppress. Unfortunately, the trial court made limited factual findings. Specifically, the court said only that the totality of the circumstances did not justify an investigative stop. In particular, the court felt that more was required than the defendant's presence in front of a building known to be the center of drug distribution activity and the fact that the defendant ran away when approached by police.
When we review rulings on motions to suppress, we accept the trial court's factual findings if "they are supported by competent, credible evidence." State v. Retherford (1994), 93 Ohio App.3d 586, 592. After accepting these facts as true, we independently decide "as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." Id. (citations omitted).
Notably, in making its findings, the trial court did not considerIllinois v. Wardlow (2000), 528 U.S. 119, 120 S.Ct. 673,145 L.Ed.2d 570, which was issued several months before the suppression hearing. InWardlow, the United States Supreme Court held that a defendant's unprovoked flight from police in an area of heavy narcotics trafficking gives officers reasonable suspicion that the defendant is involved in criminal activity, and justifies an investigative stop. Since the defendant in the present case ran from police in a high crime area, the State contends that the trial court erred in granting the motion to suppress.
In response to the State's argument, Kimble makes two points. First, he says that this case differs factually from Wardlow. Second, Kimble argues that even if the police had reasonable suspicion to make an investigatory stop, the State failed to prove that the subsequent "pat-down" search was reasonable.
As a preliminary point, we disagree that the facts of Wardlow are significantly different. In Wardlow, the defendant fled after seeing a caravan of police vehicles converge on an area known for heavy drug trafficking. Officers chased him, conducted a pat-down protective search for weapons, and found a handgun. This is not unlike what happened in the present case, i.e., Kimble was in a known drug and weapons crime area, and fled after seeing the police arrive.
In Wardlow, the lower courts suppressed the evidence, but the United States Supreme Court felt the motion to suppress should have been overruled. In this regard, the Court rejected the State's request for a "per se" rule, which would authorize the detention of anyone who flees at the sight of an officer. Instead, the Court retained the view that "the totality of the circumstances" is the appropriate test for assessing whether officers have a reasonable suspicion of criminal activity. Id.
at ___, 120 S.Ct. 677, 145 L.Ed.2d 578 (Stevens, concurring in part and dissenting in part). On the other hand, the Supreme Court did specifically focus on two factors: 1) the defendant's presence in an area of heavy narcotics trafficking; and 2) the defendant's unprovoked flight when he noticed the police. Id. at ___, 120 S.Ct. 676, 145 L.Ed.2d 576.
Concerning the unprovoked flight, the Court remarked that:
 [o]ur cases have recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion.
* * *
 Headlong flight — whenever it occurs — is the consummate act of evasion: it is not necessarily indicative of wrongdoing, but it is certainly suggestive of such.
* * *
 And any "refusal to cooperate, without more, does not justify the minimal level of objective justification needed for a detention or seizure." * * * But unprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not "going about one's business"; in fact, it is just the opposite. Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning.
Id. at ___, 120 S.Ct. 676, 145 L.Ed.2d 576-77(citations omitted).
Four dissenting members of the Supreme Court agreed that adopting a "per se" rule for either the State or defendants was not wise. However, they stressed that the following factors might be relevant to a decision about a defendant's flight in a particular case:
 the time of day; the number of people in the area, the character of the neighborhood, whether the officer was in uniform, the way the runner was dressed, the direction and speed of the flight, and whether the person's behavior was otherwise unusual.
Id. at ___, 120 S.Ct. 679, 145 L.Ed.2d 580. After applying these factors, the dissent felt suppression was appropriate because the totality of the circumstances did not justify the stop. Id. at ___,120 S.Ct. 683, 145 L.Ed.2d 584 (Stevens, concurring in part and dissenting in part).
In light of Wardlow, we find that Officer Mullins' investigatory stop of Kimble was appropriate. Although Mullins was not specifically investigating a drug tip, he was aware that the neighborhood in question was a high drug and weapons crime area. Furthermore, Mullins was summoned to the scene via a 911 disconnect call and had no idea what he might encounter when he arrived. Under the circumstances, and upon seeing a person in the immediate area flee when the police arrived, a reasonable officer would believe that criminal activity was afoot.
In a similar situation, a majority of the Seventh District Court of Appeals followed Wardlow and found that stopping a fleeing defendant was reasonable. State v. Whitfield (Nov. 1, 2000), Mahoning App. No. 99 CA 111, unreported, p. 3. The majority in Whitfield further found that handcuffing the defendant was a reasonable means of detention during the investigatory stop and did not convert the stop into an arrest. In this regard, the majority relied on the defendant's prior unprovoked flight and the risk that he would flee at the first opportunity if not handcuffed. Id.
The Seventh District did emphasize that conducting an investigatory stop and performing a frisk during the stop are "two distinct acts."Id. at 4. As a result, the legality of a stop does not validate a subsequent "frisk." In this context, the Seventh District noted that a frisk may not be based on a belief that the defendant possesses drugs. However, officers may make a protective sweep of the defendant's clothing if they believe he or she is armed and dangerous. Among the circumstances validating this belief are "furtive movements, a noticeable bulge which could be a weapon, and the officers' familiarly with an area that is known for a high incidence of drug or other criminal activity."Id.
Ultimately, the majority in Whitfield validated the frisk, by finding that a reasonably prudent officer would have been warranted in believing the defendant was armed. In particular, the majority relied on these facts: 1) the officers had been dispatched to a vacant house based on reported drug use at the house; 2) drug use at the vacant house was a common call; 3) the defendant was trespassing at the house and fled with three other people when the officers arrived; 4) after the defendant was caught, the three others were still in the process of fleeing; 5) the other available police officer ran away to catch another individual, leaving the officer who conducted the frisk without the protection of his vehicle or cover; and 6) the frequent involvement of weapons in drug transactions. Under the circumstances, the court found that the officer acted reasonably in determining, for his own safety, if the detainee had a weapon.
While the facts in the present case are somewhat less compelling, we still believe the officers acted reasonably in frisking Kimble. As we mentioned earlier, the neighborhood was known for drugs and weapons, and frequent arrests for such crimes had occurred. Additionally, the person Kimble had been with was not in police custody, and the officers were simply taking prudent steps to ensure their safety. More important, however, the officers still did not know the nature of the 911 call when they frisked Kimble. Specifically, for all the officers knew, a violent crime may have occurred. Admittedly, the 911 call could have been a prank or mistake, or the alleged crime could have been non-violent. Nonetheless, the details were unknown, and the officers acted reasonably, for their safety, in patting Kimble down.
Based on the above discussion, we find that the trial court erred in failing to consider the applicability of Wardlow. Furthermore, in view of the record presented, the trial court should have found that the officers had reasonable suspicion to conduct the investigatory stop and to frisk the defendant. Accordingly, the State's single assignment of error is sustained. The decision of the trial court is, therefore, reversed, and this case is remanded for further proceedings.
 ___________ BROGAN, J.
GRADY, J., and YOUNG, J., concur.