CIKLIN, J.,
dissenting.
I must respectfully dissent. Regala-do’s pizza restaurant handgun exhibition as reported by the tipster, coupled with the observations made by Officer Castro, did constitute, under the totality-of-the-circumstances analysis, a reasonable suspicion justifying a Terry stop. Furthermore, the open display of a weapon, regardless of whether an individual holds a concealed weapons permit, is an illegal activity which might justify a stop. The trial court was correct when it denied Regalado’s motion to suppress.
The majority seems to hinge its opinion on the question of whether Regalado’s flashing of his handgun in a pizza parlor was in and of itself illegal. While I believe the law prohibits what Regalado did in the restaurant, illegal conduct is not the exclusive starting point in a Fourth Amendment analysis — even when a Terry stop originates with an anonymous tip. Fourth Amendment analysis begins with “a well-founded, articulable suspicion of criminal activity” — “a reasonable suspicion that a person has committed, is committing, or is about to commit a crime.” Popple v. State, 626 So.2d 185, 186 (Fla.1993). The flashing of a gun is simply one of the many factors to be considered in ascertaining the required “suspicion” for a Terry stop. The body of caselaw in this area utilizes a totality-of-the-circumstances analysis in consideration of a proper stop. See Alabama v. White, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) (holding an anonymous tip may be sufficiently corroborated by the observations of officers in the field to serve as a basis for an investigatory stop); Cox v. State, 975 So.2d 1163, 1167 (Fla. 1st DCA 2008) (“The articulable, reasonable suspicion necessary to justify a lawful investigatory stop or detention is ‘not readily, or even usefully, reduced to a neat set of legal rules,’ and the courts must consider the totality of the circumstances.” (citations omitted)); Lee v. State, 868 So.2d 577, 580 (Fla. 4th DCA 2004) (“While an anonymous tip can provide the basis for an investigatory stop, the tip must contain sufficient indicia of reliability to furnish the police with reasonable suspicion that defendant is engaged in criminal activity; such reliability is judged by (a) its specificity and (b) independent police corroboration of significant aspects of the informant’s predictions.” (citations omitted)); Grant v. State, 718 So.2d 238, 239 (Fla. 2d DCA 1998) (“Factors that may be considered [in determining an officer’s reasonable suspicion of criminal activity to justify an investigatory stop] include: the time of day; the appearance and behavior of the suspect; the appearance and manner of operation of any vehicle involved; and anything incongruous or unusual in *608 the situation as interpreted in light of the officer’s knowledge.” (citation omitted)); Burnette v. State, 658 So.2d 1170, 1171 (Fla. 2d DCA 1995) (Factors important to assess whether to approve a stop and search by an officer who has not actually seen money or drugs exchange hands in a drive-up situation include “the officer’s narcotics experience; the reputation of the location for drive-up transactions; the extended period of surveillance; and the history of previous multiple arrests from that site.”); State v. Wise, 603 So.2d 61, 63 (Fla. 2d DCA 1992) (discussing factors bearing on whether officer has reasonable suspicion to conduct a stop pursuant to a be-on-the-lookout report, including amount of. time since offense, distance from offense, specificity of description of vehicle and occupants, and source of BOLO information); Steele v. State, 561 So.2d 638, 641 (Fla. 1st DCA 1990) (“The reasonableness of the officer’s suspicion must be based on the totality of the circumstances, encompassing such factors as the time of day, the locale of the stop, the appearance and behavior of the suspect, and the officer’s training and experience.” (citations omitted)).
Indeed, most cases discuss “reasonable suspicion” to initiate a Terry stop as requiring an unlawful act or unusual conduct or suspicious behavior or a combination of these factors. This is an accumulative analysis not dependent on one single fact.
The majority’s concentration on whether Regalado’s initial weapon exhibition was illegal or not, is, I respectfully submit, not the determining factor in our analysis. If there is any central theme to the decisional law that has developed in this area, it is this:
In reviewing the propriety of an officer’s conduct, courts do not have available empirical studies dealing with inferences drawn from suspicious behavior, and we cannot reasonably demand scientific certainty from judges or law enforcement officers where none exists. Thus, the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior.
[[Image here]]
In allowing such detentions, Terry accepts the risk that officers may stop innocent people. Indeed, the Fourth Amendment accepts that risk in connection with more drastic police action; persons arrested and detained on probable cause to believe they have committed a crime may turn out to be innocent. The Terry stop is a far more minimal intrusion, simply allowing the officer to briefly investigate further. If the officer does not learn facts rising to the level of probable cause, the individual must be allowed to go on his way.
Illinois v. Wardlow, 528 U.S. 119, 124-25, 126, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (citations omitted).
Under a totality-of-the-circumstances analysis, it is clear that the trial court was correct when it denied Regalado’s motion to suppress.
Unlike the facts in J.L., Ubiles, and Baptiste II, as cited by the majority to support its decision, the facts of this case provided Officer Castro with a reasonable suspicion to conduct a stop to investigate what, at the very least, was unusual conduct or suspicious behavior. In the instant matter, we have a tipster’s report of a person with a gun tucked into his waistband showing off the weapon to his friends in a pizza restaurant. We have a face to face conversation between the tipster and the investigative officer with the tipster specifically pointing out the gun flashing suspect before the stop. We have the investigating police officer maintaining visual contact with the suspect from the instant *609 the tipster pointed him out until the investigating officer conducted the Terry stop. We have furtive movement by the suspect blending into a large crowd of Riverfront patrons who, as observed by Officer Castro and in the words of the officer, was “looking back and forth and back and forth.” We have a police officer who was within six to eight feet of an alleged gun toting suspect with a bulge under his shirt who, based on the training, experience, and opinion of Officer Castro, was most likely carrying a firearm in his waistband. In other words, Regalado was not stopped solely because he might be in possession of a gun.
The majority also emphasizes the possibility that Regalado may have had a concealed weapons permit, the lack of which, the majority urges “cannot [be] glean[ed] by mere observation.” To suggest that an officer must engage in an analysis as to whether a gun wielding suspect might possess a concealed weapons permit, which cannot be readily observed, is a dangerous premise. Indeed, in Terry v. Ohio, 392 U.S. at 23-24, 88 S.Ct. 1868 the United States Supreme Court clearly indicated the need to ensure safety of law enforcement officers:
... [I]t would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded. Virtually all of these deaths and a substantial portion of the injuries are inflicted with guns and knives.
In view of these facts, we cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.
(footnote omitted).
Even if Officer Castro had been required to consider whether Regalado had a concealed weapons permit, it does not change the fact that there was the equal possibility that the defendant did not have a permit:
Even in Terry, the conduct justifying the stop was ambiguous and susceptible for an innocent explanation. The officer observed two individuals pacing back and forth in front of a store, peering into the window and periodically conferring. All of this conduct was by itself lawful, but it also suggested that the individuals were easing the store for a planned robbery. Terry recognized that the officers could detain the individuals to resolve the ambiguity.
Wardlow, 528 U.S. at 125, 120 S.Ct. 673 (citations omitted).
Assume, for argument’s sake, that the majority is correct in suggesting that a report of illegal conduct was necessary in this case before Officer Castro could effectuate a stop. Section 790.053(1), Florida Statutes (2008), prohibits “any person to openly carry on or about his or her person any firearm.” See also § 790.10, Fla. Stat. (“If any person having or carrying any ... firearm ... shall, in the presence of one or more persons, exhibit the same in a rude, careless, angry, or threatening manner, not in necessary self-defense, the person so offending shall be guilty of a misde *610 meanor of the first degree.”). The majority is correct that a person may obtain a license to carry a concealed weapon, but that protection only extends so long as the gun is concealed. § 790.06(1), Fla. Stat. (“The Department of Agriculture and Consumer Services is authorized to issue licenses to carry concealed weapons or concealed firearms.”). A concealed weapon is defined to include a deadly weapon “carried on or about a person in such a manner as to conceal the weapon from the ordinary sight of another person.” § 790.001(3)(a), Fla. Stat. Openly showing a gun to another person violates section 790.053(1), Fla. Stat., whether or not the owner has a license to carry a concealed weapon. See Op. Att’y Gen. Fla. 91-36 (1991) (“Thus, the possession of a concealed weapons license does not authorize a person to openly carry a weapon.”). I believe Regalado’s improper exhibition of the gun that he had stuck in his pants was an illegal activity.
So while I obviously disagree with the majority’s contention that only a tip of illegal conduct can lead to a constitutionally permitted Terry stop, Regalado’s alleged and potentially. dangerous gun exhibition was just that. And whether Regalado may have been issued and continued to possess a valid concealed weapons permit is, on many different levels, of little import.
With well due and utmost respect to my colleagues in the majority, I dissent. This was a “good stop” and the trial court’s denial of Regalado’s motion to suppress should be affirmed.