J-S33011-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| v. | |
| LACY COLBERT | |
| Appellant | No. 987 WDA 2015 |

Appeal from the Judgment of Sentence May 20, 2015
in the Court of Common Pleas of Allegheny County Criminal Division
at No(s): CP-02-CR-0014964-2014

BEFORE: GANTMAN, P.J., OLSON, J., and FITZGERALD,[*] J.

MEMORANDUM BY FITZGERALD, J.:          **FILED: May 17, 2016**

Appellant, Lacy Colbert, appeals from the judgment of sentence entered in the Allegheny County Court of Common Pleas following his non-jury trial convictions for firearms not to be carried without a license[1] and resisting arrest.[2] Appellant contends the trial court erred in denying his motion to suppress evidence. We affirm.

On August 7, 2014, Appellant was arrested for the above crimes. On April 20, 2015, he filed a motion to suppress evidence claiming police did not have probable cause to arrest Appellant. Mot. to Suppress, 4/20/15, at 1-4. Specifically, Appellant averred he "was pursued under the mistaken belief

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. § 6106(a)(1).

[2] 18 Pa.C.S. § 5104.

that he was warrant suspect Zachary Threats and based on this mistaken belief he was pursued and unlawfully arrested." ***Id.*** at 3.

The trial court held a suppression hearing on May 20, 2015, at which the Commonwealth presented the testimony of Detective Calvin Kennedy of the Pittsburgh Police Department. Appellant did not present any evidence. Following the hearing, the trial court made the following findings of fact and conclusions of law:

> That Officer Calvin Kennedy, an officer with 21 years [of] experience with the Pittsburgh Police Department with a special focus in professional development in the field of narcotics since 2001, and also has training in firearms, firearms recognition of potentially armed individuals based on various factors such as hand movements, certain movements toward certain areas of the body, clothing, bulges, things of that nature. Also[, he] made hundreds of firearms arrests during his years of experience on the Pittsburgh Police Force.
>
> On August 5 of 2014, there was a broadcast, a BOLO,[3] . . . a warrant for a one, Zachary Threats . . . for homicide. Mr. Threats was known to Officer Kennedy as early as 2012 by virtue of his criminal activity as well as his stature, physical stature to Officer Kennedy. In this particular instance, besides Officer Kennedy's personal knowledge of his propensity for violence and danger. In this instance the particular BOLO was that Mr. Threats would not surrender voluntarily, and he was armed and dangerous. He was known to be a person who frequented the North Side Sandusky Court area. Sandusky Court itself being known as a high crime area, guns , drugs, assaults, and criminal homicide.

---

[3] A "BOLO" is a notification for police to "be on the lookout." ***See*** N.T., 5/20/15, at 5.

On August 7, at 11:30 p.m. Officer Kennedy and his colleagues were in Sandusky Court area looking for Mr. Threats. They noticed a group of men standing near a building. Amongst them was a person of tall stature who fit the description of Mr. Threats. The officers formulated a plan to approach that person, to place Mr. Threats, if in fact it was Mr. Threats under arrest at that juncture. The plan itself, the particulars were not contested and are of record.

During the course of the execution of the plan, Officer Kennedy, as well as at least two other officers, approached a group of men. They were identified [as police officers] by virtue of their badges being displayed prominently on their chests. They came up to the group of men. [Appellant] was amongst the group of men and also was the person who Officer Kennedy believed to be Mr. Threats by a matching description or matching stature. The group was illuminated by virtue of flashlights. At that point in time [Appellant] grabbed his waistband, he looked left and right and ran into an apartment inside of Sandusky Court. He was pursued by Officer Kennedy, still under the belief that this was Mr. Threats. As they went through the doorway, Officer Kennedy further identified himself as Pittsburgh Police, grabbed [Appellant] by the sweatshirt, the hood of his sweatshirt, and spun him around. Upon spinning him around, he noticed a weapon in his waistband, eventually turned out to be .357 Taurus. A struggle ensued and [Appellant] was eventually arrested.

. . . The [c]ourt finds in this instance that Officer Kennedy and his colleagues were properly identified, they were on the premises in the area legally, and they were about to execute a warrant. At that point in time, [Appellant] displayed not only the physical characteristics of the person to be apprehended, but also at that juncture exhibited conduct consistent with possession of a weapon, including reaching for his waistband, looking left and right and then flight.

> [T]he [c]ourt finds there was reasonable suspicion and eventually . . . probable cause, and the motion to suppress is denied.

N.T., 5/20/15, at 27-30.

Appellant proceeded to a stipulated, non-jury trial, at which the trial court found him guilty of the aforementioned offenses. The court sentenced him to two years' probation for the firearms offense and two to four days' incarceration on resisting arrest. Sentencing Order, 5/20/15.

Appellant filed a timely notice of appeal and court-ordered Pa.R.A.P. 1925 statement. The trial court authored a responsive opinion.

On appeal, Appellant raises the following issue for our consideration:

> I. Did the police violate [Appellant's] rights under the Fourth Amendment of the United States Constitution and Article 1 Section 8 of the Pennsylvania Constitution by seizing his person without reasonable suspicion, and, as a result, the trial court erred in not suppressing the fruits of that constitutional error?

Appellant's Brief at 4.

Appellant contends he was "seized" the moment police officers illuminated him with their flashlights and "demanded to know what was going on." *Id.* at 15. He argues the "**only** point of suspicion, and the sole reason" the officers approached Appellant was that he, like Mr. Threats, is tall in stature and such a "glaringly vague description" is insufficient to justify the seizure. *Id.* at 18 (emphasis in original). Alternatively, Appellant argues he was seized when Detective Kennedy began chasing him, and that

- 4 -

Detective Kennedy's observations prior to the chase did not give rise to a reasonable suspicion of criminal activity. **Id.** at 20-24. We disagree.

Our standard of review over a denial of a suppression motion is well settled.

> An appellate court may consider only the Commonwealth's evidence and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the trial court, the appellate court is bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. However, it is also well settled that an appellate court is not bound by the suppression court's conclusions of law.
>
> *    *    *
>
> In appeals from suppression orders, our scope of review is limited to the evidence presented at the suppression hearing.

**Commonwealth v. Caple**, 121 A.3d 511, 516-17 (Pa. Super. 2015) (citations and footnote omitted).

> The Fourth Amendment of the Federal Constitution and Article I, Section 8 of the Pennsylvania Constitution protect individuals from unreasonable searches and seizures. To secure the right of citizens to be free from such [unreasonable] intrusions, courts in Pennsylvania require law enforcement officers to demonstrate ascending levels of suspicion to justify their interactions with citizens as those interactions become more intrusive. We have long recognized that there are three levels of intrusion involved in interactions between members of the public and the police. The first is a mere encounter, which requires no level of suspicion at all. The second level is an investigative detention, which must be supported by reasonable suspicion. Finally,

- 5 -

the third level is an arrest or custodial detention, which must be supported by probable cause.

*Commonwealth v. Walls*, 53 A.3d 889, 892-93 (Pa. Super 2012) (quotation marks and citations omitted).

"Th[e Pennsylvania Supreme] Court and the United States Supreme Court have repeatedly held a seizure does not occur where officers merely approach a person in public and question the individual or request to see identification." *Commonwealth v. Lyles*, 97 A.3d 298, 303 (Pa. 2014). However, police pursuit of a citizen constitutes a seizure, which must be supported by either probable cause or reasonable suspicion. *In re D.M.*, 781 A.2d 1161, 1164 (Pa. 2001). Accordingly, we reject Appellant's claim that he was seized when officers merely approached Appellant and "demanded to know what was going on."[4] *See* Appellant's Brief at 15; *Lyles*, 97 A.3d at 303. Nevertheless, Appellant was subject to a police seizure when he was pursued. *See In re D.M.*, 781 A.2d at 1164.

In *In re D.M.*, the Pennsylvania Supreme Court addressed the import unprovoked flight has on a determination of reasonable suspicion.

> In the seminal case of *Terry v. Ohio*, 392 U.S. 1, [] (1968), the United States Supreme Court indicated that police may stop and frisk a person where they

---

[4] Detective Kennedy testified when he approached Appellant, "I illuminated the group of males, including, [Appellant]. At that time I basically said what are you guys doing." N.T. at 9. Appellant characterizes this encounter as an "interrogation" and asks this Court to infer "authoritative tones" by police. Appellant's Brief at 16 n.1. Pursuant to the standard of review by which we are bound, we decline to do so. *See Caple*, 121 A.3d at 516-17.

had a reasonable suspicion that criminal activity is afoot. In order to determine whether the police had a reasonable suspicion, the totality of the circumstances—the whole picture—must be considered. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.

\* \* \*

In **Wardlow**,[5] the Chicago police sent a four-car caravan into a high crime area to investigate drug activity. One of the officers in the last vehicle observed the respondent on a corner with an opaque bag in his hand. The respondent looked at the officers and fled. The officers cornered the respondent and upon exiting their car, immediately conducted a brief pat-down search for weapons. During the pat-down search of the respondent, the officer discovered a gun. The issue before the court was whether sudden flight in a high crime area created a reasonable suspicion justifying a **Terry** stop.

In explaining that such a seizure was justified, the Court reiterated the **Terry** standard and concluded that an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot. The Court acknowledged that mere presence in a high crime area was insufficient to support a finding of reasonable suspicion. However, a court could consider the fact that the stop occurred in a high crime area in assessing the totality of the circumstances. Similarly, the Court held that unprovoked flight could be considered among the relevant contextual considerations, since nervous, evasive behavior is a pertinent factor in determining reasonable suspicion and [h]eadlong flight—

---

[5] **Illinois v. Wardlow**, 528 U.S. 119 (2001).

wherever it occurs—is the consummate act of evasion. . . . Based upon respondent's unprovoked flight in the high crime area, the Court concluded that the officer was justified in suspecting that criminal activity was afoot.

Following this decision, it is evident that unprovoked flight in a high crime area is sufficient to create a reasonable suspicion to justify a **Terry** stop under the Fourth Amendment.

**Id.** at 1163-64 (some citations and quotation marks omitted).

This Court clarified "nervous, evasive behavior and headlong flight all provoke suspicion of criminal behavior in the context of **response to police presence**." **Commonwealth v. Washington,** 51 A.3d 895, 899 (Pa. Super. 2012) (emphasis added).

Instantly, the uncontradicted testimony of Detective Kennedy established he was aware of a homicide warrant for a Zachary Threats, with whom he was personally familiar; he was informed Threats "would be" in Sandusky Court armed with an assault rifle; he knew Sandusky Court to be a high crime area;[6] he observed Appellant in Sandusky Court and believed he may be Threats; he approached Appellant, with his badge displayed, illuminated his flashlight, and asked a question; and Appellant then grabbed his waistband, looked left and right, and fled. N.T. 5-9, 27-30.

---

[6] Specifically, Detective Kennedy elaborated there were "numerous guns, numerous drugs, there have been numerous aggravated assaults, shootings, [and] homicides" in that area. N.T. at 9-10.

We conclude the record amply supports that Detective Kennedy had sufficient reasonable suspicion to pursue and seize Appellant. ***See Caple***, 121 A.3d at 516-17. Appellant was not seized upon Detective Kennedy's approach and request for information. ***See Lyles***, 97 A.3d at 303. At the time of Appellant's seizure, Detective Kennedy observed Appellant (1) in a high-crime area, (2) exhibit behavior consistent with possession of a firearm, and (3) flee in response to police presence.[7] ***See In re D.M.***, 781 A.2d at 1163-64; ***Washington,*** 51 A.3d at 898.

Judgement of sentence affirmed.


Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/17/2016

---

[7] Appellant acknowledges the police badges were "clearly displayed around their necks" yet avers he "did not know he was running from police." ***Compare*** Appellant's Brief at 15, 16, 18, ***with id.*** at 22. The evidence, in the light most favorable to the Commonwealth, supports Appellant was aware he was fleeing in response to police presence. ***See Caple***, 121 A.3d at 516-17; ***Washington***, 51 A.3d at 899.