[Cite as *State v. Lewis*, 2016-Ohio-7170.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### CRAWFORD COUNTY

STATE OF OHIO,

     PLAINTIFF-APPELLEE,                    CASE NO. 3-16-02

     v.

ERIN J. LEWIS,                            O P I N I O N

     DEFENDANT-APPELLANT.

Appeal from Crawford County Common Pleas Court
Trial Court No. 15-CR-0360

**Judgment Affirmed**

Date of Decision:   October 3, 2016

APPEARANCES:

    *Adam Charles Stone* **for Appellant**

    *Robert J. Kidd* **for Appellee**

**SHAW, P.J**

{¶1} Defendant-appellant, Erin Lewis ("Lewis"), brings this appeal from the January 15, 2015, judgment of the Crawford County Common Pleas Court sentencing Lewis to seven years in prison after Lewis plead no contest to, and was found guilty of, Possession of Heroin in violation of R.C. 2925.11(A)/(C)(6)(d), a felony of the second degree. On appeal, Lewis specifically challenges the trial court's decision overruling his motion to suppress.

*Relevant Facts and Procedural History*

{¶2} On November 9, 2015, Lewis was indicted for one count of Possession of Heroin in an amount that equaled or exceeded one hundred unit doses but was less than five hundred unit doses or equaled or exceeded ten grams but was less than fifty grams in violation of R.C. 2925.11(A)/(C)(6)(d), a felony of the second degree. Lewis pled not guilty to the charge.

{¶3} On January 11, 2016, Lewis filed a motion to suppress evidence arguing, *inter alia*, that: 1) the State did not have probable cause to stop the vehicle he was a passenger in; 2) the State impermissibly extended the traffic stop to allow a canine sniff of the vehicle; 3) the State did not have a lawful reason to pat-down Lewis; and 4) the State did not have probable cause to detain or arrest Lewis.

{¶4} On January 14-15, 2016, a hearing was held on Lewis's motion to suppress. At the hearing the State called six witnesses, which included various

-2-

members of the Bucyrus Police Department involved with investigating this case. After hearing the evidence, the trial court overruled Lewis's motion in open court. In doing so, the trial court provided a lengthy analysis of each of the issues raised by Lewis and the evidence that had been presented during the two-day suppression hearing.

{¶5} On January 15, 2016, after his suppression motion was overruled, Lewis elected to plead no contest to the charges.[1] The trial court conducted a Crim.R. 11 colloquy with Lewis to determine that Lewis was knowingly, intelligently, and voluntarily entering his plea, then had the State recite a brief factual narrative related to the charges. Lewis plead no contest, and the trial court found Lewis guilty of Possession of Heroin as indicted.

{¶6} Lewis was sentenced to serve seven years in prison. A judgment entry memorializing Lewis's sentence was filed January 15, 2016. Later, on February 10, 2016, the trial court also filed an entry memorializing its ruling related to the suppression motion, stating that for the reasons placed on the record at the hearing, Lewis's suppression motion was overruled.

{¶7} Lewis now appeals his conviction, asserting the following assignment of error for our review.

---

[1] A written plea agreement is provided in the record. (Doc. No. 17).

**ASSIGNMENT OF ERROR**
**THE TRIAL COURT'S RULING TO DENY APPELLANT'S MOTION TO SUPPRESS WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

{¶8} In his assignment of error, Lewis argues that the trial court erred by overruling his motion to suppress. Specifically, Lewis contends that the Bucyrus police improperly stopped the vehicle Lewis was a passenger in and that "based upon the totality of the evidence" the State lacked probable cause to arrest Lewis. (Appt.'s Br. at 2).

{¶9} A review of the denial of a motion to suppress involves mixed questions of law and fact. *State v. Burnside,* 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. At a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to evaluate the evidence and the credibility of witnesses. *Id.*; *see also State v. Carter,* 72 Ohio St.3d 545, 552 (1995). When reviewing a ruling on a motion to suppress, "an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Burnside* at ¶ 8, citing *State v. Fanning,* 1 Ohio St.3d 19 (1982). With respect to the trial court's conclusions of law, however, our standard of review is *de novo*, and we must independently determine whether the facts satisfy the requisite legal standard. *Id.,* citing *State v. McNamara,* 124 Ohio App.3d 706 (4th Dist.1997).

{¶10} In this case, Lewis filed a suppression motion seeking to suppress evidence of 135 heroin bindles that were found after Lewis was arrested following

-4-

a traffic stop on October 29, 2015. A two-day hearing was held on Lewis's suppression motion, wherein the State first called Captain Neil Assenheimer from the detective bureau of the Bucyrus Police Department to testify as to an ongoing investigation of Lewis.

{¶11} Captain Assenheimer testified that on May 6, 2015, he received information from a confidential informant that the informant had driven Lewis to Columbus so that Lewis could bring back "a large amount of heroin * * * after meeting with * * * a Mexican Cartel member." (Tr. at 7). According to Captain Assenheimer, the informant drove Lewis on a specified route on State Route 61 to "avoid State Route 4." (*Id*. at 8). The informant told Captain Assenheimer that Lewis personally "carried it" on the way back, meaning carrying the heroin on his person. (*Id*. at 12).

{¶12} Captain Assenheimer testified that the police department received more information in August of 2015 that Lewis and his girlfriend Heather Hunt were going to Columbus to purchase drugs. Then, Captain Assenheimer testified that on October 8, 2015, a second confidential informant informed the department that Lewis and Heather Hunt were making trips to Columbus for "large amounts" of heroin. (Tr. at 10). The informant advised the police department at that time that Ashley Alspach was one of the people who drove Lewis to Columbus. It was

indicated that Alspach drove her green Pontiac with Lewis so that Lewis could acquire the heroin.

{¶13} On the same date, October 8, 2015, the Bucyrus Police Department was notified that a traffic stop was conducted by the State Highway Patrol on Ashley Alspach's green Pontiac. Lewis was in Alspach's vehicle at the time, along with Alspach and two others. The stop was unrelated to this investigation and Captain Assenheimer was not aware whether any traffic ticket was issued as a result of the stop by the State Highway Patrol.

{¶14} Captain Assenheimer testified that on October 11, 2015, Alspach's green Pontiac was observed to be parked at Lewis and Heather Hunt's residence. Later on October 11, 2015, a confidential informant told the police department that "they" were going to make a trip to Columbus for heroin that same day. (Tr. at 12).

{¶15} Captain Assenheimer then used the information that he had at that point to get a search warrant to place a GPS unit on Alspach's vehicle to track its movements. That warrant was issued and a GPS unit was placed on Alspach's vehicle on October 23, 2015.

{¶16} Captain Assenheimer testified that the whereabouts of the Alspach vehicle were then tracked from October 23, 2015 to October 29, 2015. Captain Assenheimer testified that there were trips to Marion,[2] two or three trips to Delaware

---

[2] The trips to Marion were identified as likely being to Alspach's gynecologist, as she was pregnant.

and a trip to Columbus in addition to driving around Bucyrus. Captain Assenheimer testified that the trip to Columbus was similar in route to what the confidential informant had told Captain Assenheimer that Lewis took with the informant to purchase heroin.

{¶17} The State next called David Koepke, the Bucyrus Chief of Police. Chief Koepke testified that he was aware of, and involved with, the investigation of Lewis and Ashley Alspach. Chief Koepke testified that he was the individual designated to receive the GPS data from the GPS unit that had been placed on Alspach's vehicle when the warrant was acquired. Chief Koepke testified that he started getting information from the GPS on October 23, 2015, and that it was accurate up to ten meters.

{¶18} Chief Koepke testified that Alspach's vehicle traveled frequently, almost as much as a police cruiser. Chief Koepke also testified that the vehicle was making trips to Delaware and staying there half an hour or less. Chief Koepke testified as to the GPS data for October 23, 2015, where the vehicle stopped briefly at multiple locations. Chief Koepke testified that he did not know what the vehicle was doing, but it made him suspicious. Chief Koepke testified that the vehicle was "consistent" in that it would make a short stop south then return to Bucyrus. (Tr. at 44). Chief Koepke testified that there was similar data for the vehicle each day until October 29, 2015, when Alspach's vehicle was stopped and Lewis was detained.

{¶19} Chief Koepke testified that he sent an officer to follow Alspach's vehicle on one occasion to Marion, and that was when they learned that the vehicle was visiting a doctor's office. Chief Koepke testified that they then tried to "tail" the vehicle a second time on October 29, 2015. Chief Koepke testified that he was getting information that the vehicle was going south, toward Columbus, and that they wanted to find the end of the trip to make observations.

{¶20} Chief Koepke testified that he then rode with Captain Greathouse in a minivan to follow Alspach's vehicle. Chief Koepke testified that Alspach's vehicle traveled on US 23 southbound to 270 and into the "Schrock Road area at 270 and I71." (Tr. at 46). Chief Koepke testified that he was familiar with the area and that it was "seen in a pattern of drug couriers," from prior investigations. (*Id.*) Chief Koepke testified that it was a "place you could locate Mexican Cartel sources," and purchase heroin. (*Id.* at 47). Chief Koepke testified that Alspach's vehicle made three short stops altogether; one at an apartment complex, one at a Speedway, and one at a Moose Hall. According to Chief Koepke, all of the stops were five minutes or less.

{¶21} Chief Koepke testified that the Alspach vehicle had roughly a fifteen-minute head-start on his tailing vehicle when the officers left Bucyrus, but the officers were still able to track the car via the GPS monitor. Chief Koepke testified

that the Alspach vehicle took a route other than Route 4 to get to Columbus, which was not the quickest route, consistent with what the confidential informant had said.

{¶22} Chief Koepke testified that they were never able to get close enough to Alspach's vehicle to see it while it was in Columbus due to traffic, but they continued to monitor the vehicle through the GPS unit. Chief Koepke testified that they saw the vehicle as it returned to head north, however, when Alspach's vehicle stopped at a rest area. Chief Koepke testified that at the rest area he was able to specifically observe the green Pontiac with Lewis and Alspach in it.

{¶23} Chief Koepke testified that they followed the vehicle shortly after it left the rest area and notified officers in Bucyrus of the vehicle's pending return to try and stop it once it was back in Crawford County.

{¶24} Chief Koepke testified that on the drive north he observed Alspach's vehicle driving "recklessly," "[w]eaving left of center and at a high rate of speed." (Tr. at 52-53). Chief Koepke testified that as they were following the vehicle into Bucyrus, he visually observed it going approximately 20 mph over the speed limit, "which would be about 55 in a 35." (Tr. at 53). Chief Koepke testified that Captain Greathouse was driving 55 at the time to try to keep up and Alspach's vehicle was actually pulling away, so they were "pacing" it and able to determine the speed. (*Id.*)

**{¶25}** Chief Koepke testified that while Captain Greathouse was driving he spoke with Dan Wurm, an Adult Parole Officer, because Alspach is a "probationer that [Wurm was] responsible for." (Tr. at 51). Chief Koepke testified that he informed Wurm of what was going on and Wurm told him to hold Alspach and take her into custody.

**{¶26}** Daniel Wurm testified at the suppression hearing, corroborating the testimony of Chief Koepke, that Ashley Alspach was on probation and that he was supervising her.[3] Wurm testified that on October 29, 2015, he received a call from Chief Koepke that they were investigating individuals who may be going to Columbus to bring heroin back to Crawford County to sell. Wurm was told that Alspach was driving the vehicle. Wurm indicated that he wanted to detain Alspach to see about any involvement in the matter and pursue any type of probation violation. Wurm testified that based on the information presented to him, and information he already had regarding Alspach's drug relapses, he "issued a verbal order for a holder on [Alspach]."[4] (Tr .at 94).

**{¶27}** Chief Koepke testified that he relayed the oral holder to Lieutenant Walker of the Bucyrus Police Department. Chief Koepke also testified that he notified Lieutenant Walker of Alspach's speeding violation and told Walker to stop

---

[3] Wurm testified that Alspach was originally placed in the drug court program and that she successfully completed it, but afterward rumors began that Alspach was "running around with the wrong crowd." (Tr. at 91). Alspach also admitted to Wurm that she had relapsed on five to six different occasions.

[4] Wurm testified that a written holder was not made until five days later.

the vehicle. On cross-examination Chief Koepke testified that there was actually a vehicle between the officers' and the Alspach vehicle as they came toward Bucyrus, but he "could see the taillights" and make "a general estimate that we were above the speed limit." (Tr. at 86).

{¶28} The State next called Captain Joseph Greathouse of the Bucyrus Police Department. Captain Greathouse testified that he was driving the minivan, with Chief Koepke as his passenger, as the Bucyrus police attempted to follow Alspach's green Pontiac to Columbus on October 29, 2015. Captain Greathouse testified that being stuck in traffic prevented them from visually observing the Pontiac in Columbus, but they were able to track its movements from the GPS coordinates. Captain Greathouse also testified that when the Pontiac left Columbus to proceed north and stopped at a rest area, he visually observed Alspach as the driver and Lewis as the passenger.

{¶29} Captain Greathouse testified that there were several points when he had visual contact with the green Pontiac on the return trip to Bucyrus, particularly as it neared Bucyrus. Captain Greathouse testified that as the vehicle entered the city of Bucyrus, he visually estimated that Alspach was driving over 55 mph. "I was doing 55 as I was hitting the corporation limits on my vehicle and was not gaining on the vehicle that Ashley Alspach was driving." (Tr. at 108). Captain Greathouse testified that the speed limit at that time was 35. Captain Greathouse

testified that he relayed the information to Chief Koepke, who then contacted Lieutenant Walker to tell him to stop the Pontiac.

{¶30} Lieutenant Tom Walker then testified that he was called by Chief Koepke on October 29, 2015, and told to stop Alspach's vehicle. Lieutenant Walker testified that Chief Koepke apprised him of the investigation and informed him that the driver, Alspach, had an active "warrant," which he later learned was "a verbal pickup order from adult probation." (Tr. at 155). Lieutenant Walker then stopped Alspach's vehicle and asked her about the "warrant" and the traffic violations.

{¶31} A canine officer, Patrolman David Rowland, testified that he was on standby to conduct a canine sniff of Alspach's Pontiac when Lieutenant Walker stopped it. Patrolman Rowland testified that he had a visual on the Pontiac when Lieutenant Walker made the stop and that within five seconds Patrolman Rowland was pulled over with Lieutenant Walker.

{¶32} Lieutenant Walker testified that after he stopped Alspach's vehicle and asked her about the "warrant" and traffic violation, he removed Alspach and Lewis from the vehicle before the canine sniff was conducted, which he testified was the policy of the Bucyrus Police Department. Lieutenant Walker patted down Alspach and Lewis for weapons, and located none. However, Lieutenant Walker testified that Lewis was "nervous" as Lieutenant Walker got around Lewis's waistband, that he was "fidgety" and "shaking." (Tr. at 164). Lieutenant Walker testified that while

Lewis appeared nervous during the pat-down, he did not appear nervous later during the canine search. In addition, Lieutenant Walker testified that Alspach and Lewis were asked where they were coming from and Alspach said that they had gone to Galion and Lewis said that Alspach picked him up and taken him "somewhere." (*Id*. at 165). Neither mentioned having been to Columbus.

{¶33} Patrolman Rowland then conducted the canine sniff of the vehicle, and he testified that the canine alerted on the driver-side door of the vehicle. Patrolman Rowland also testified that he noted a change in behavior in the canine on the passenger side of the vehicle. Lieutenant Walker and Patrolman Rowland then searched the vehicle, but did not locate any drugs or drug paraphernalia in the vehicle.[5] Patrolman Rowland testified that drugs can leave a residual odor even if the drugs are removed. Patrolman Rowland testified that at one point during the search Lieutenant Walker said to him that the drugs might be on Lewis or Alspach. Lieutenant Walker testified that initially he thought Alspach was hiding the drugs because it had become "a very common practice especially as of late, because a lot of the ladies are sticking [the drugs] up inside of them." (Tr. at 159)

{¶34} Lieutenant Walker testified that it was his intention after the search of the vehicle to arrest Alspach based on the verbal APA holder. Lieutenant Walker testified that he then had a conversation with Chief Koepke and Captain Greathouse

---

[5] Prior to searching the vehicle, but after the canine alerted on the vehicle, Lewis and Alspach were briefly searched again.

regarding what should be done with Lewis. Lieutenant Walker testified that he was informed by them to place Lewis "under arrest" or detain him for further questioning.

**{¶35}** Captain Greathouse testified that he made the ultimate decision to arrest/detain Lewis at that point. He gave the following reasoning for that decision.

> **Well, based on the totality of the circumstances with what – with the GPS search warrant, the probable cause to obtain the GPS search warrant, what we were witnessing there had been five previous trips – well, four previous trips. This would have been the fifth trip with this vehicle to an area where we had known that, you know, common for individuals to travel to pick up narcotics to bring back to the City of Bucyrus. Also visually observing that Erin Lewis was in the vehicle, also had information from a source, which Captain Assenheimer I assume would have testified to, that Erin Lewis was known to carry the drugs on his person, and with the canine alert, with – with the route they took back where they stopped in Columbus in the area of Cleveland Av [sic] and Schrock in a known location where drugs are commonly sold, and then with the \* \* \* dog alerting to the vehicle, and with Officer Walker – Lieutenant Walker advising me that when he was patting down Erin Lewis, he became – he showed a change in his behavior whenever he would get close to the waist area of Mr. Lewis. At that point I believed it was appropriate to detain Mr. Lewis longer in order to obtain a search warrant to search his person further to see if he was concealing any narcotics.**

(Tr. at 111-112).

**{¶36}** Lieutenant Walker testified that he then searched Lewis's person once he was arrested; however, he testified that Lewis was wearing very "baggy clothes"

-14-

that were "pretty thick" so he could not search Lewis very thoroughly.[6] (Tr. at 163). Lieutenant Walker testified that even after the subsequent search he "absolutely" believed that there were places for potential contraband to be. (*Id.*) Videos of the traffic stop and search were played for the trial court and entered into evidence.[7]

{¶37} Although the trial court specifically stated that it would not consider testimony related to what was ultimately found on Lewis, Lieutenant Walker did offer such testimony. Lieutenant Walker testified that he transported Lewis to the station and that during the transport Lieutenant Walker could see Lewis fidgeting in the back seat in a manner that was "uncommon" and "more characteristic of somebody that's attempting to hide drugs."[8] (Tr. at 168). When they arrived at the station, Lieutenant Walker got Lewis out of his vehicle and noticed that something fell on the ground. It turned out to be a "clear plastic baggy with [135] tin foil balls [of heroin] in it." (*Id*. at 169).

{¶38} Based on the evidence presented, the trial court conducted a lengthy analysis on the record analyzing all branches of Lewis's suppression motion. After analyzing all of the evidence, the trial court determined that "the police had two reasons to stop this vehicle, probable cause for speeding, and a Terry stop." (Tr. at

---

[6] The video from the officer's body camera shows that Lewis was wearing a baggy red sweatshirt and what appeared to be red sweatpants.
[7] The video from Lieutenant Walker's cruiser showed the stop of Alspach's vehicle, the canine alerting on the vehicle and the search of the vehicle.
[8] This testimony is corroborated by the video evidence.

227). The trial court then analyzed whether the canine sniff was done in an appropriate amount of time and also, *inter alia*, whether there was probable cause to arrest Lewis.

**{¶39}** The trial court stated that it seemed that the primary issue Lewis was arguing in his suppression motion was whether there was probable cause to arrest him. The trial court stated that it had to look at the totality of the circumstances when making that decision. The trial court then cited the following factors that the police had available in considering whether to arrest Lewis[9]: 1) Two confidential informants provided information that people from Crawford County were going to Columbus to purchase heroin and bringing it back to sell, specifically Lewis and his girlfriend Heather Hunt. The first informant indicated that he or she had personally driven Lewis to purchase the heroin, and that Lewis kept the heroin on his person on the return trip; 2) A second confidential informant provided information that Alspach was driving Lewis in her green Pontiac to meet with the Mexican Cartel in Columbus; 3) Alspach had been convicted of a drug-related offense, was a known drug user, had been pulled over previously by the State Highway Patrol with a known drug dealer in her vehicle, and had been driving around "as much as a police car would" when her vehicle was being tracked by the GPS unit; 4) Some of the

---

[9] While there may be additional factors we have noted in the record, these particular factors are the ones the trial court specifically mentioned when overruling Lewis's suppression motion. Notably, the trial court did not number its factors, we do that simply for clarity.

trips made by Alspach's vehicle were "very suspicious," such as brief trips with short stops to a distant Wal-Mart when one was far closer; 5) Alspach's vehicle took a circuitous route in order to travel south to Columbus, particularly a route that an informant had stated Lewis made on his drug-buying trips in the past, including one trip with the actual informant; 6) On October 29, 2015, the day Alspach's vehicle was stopped, Alspach's vehicle made "very suspicious" "short" stops including one at Schrock Road, a known drug area;[10] 7) Once Alspach's vehicle was stopped, Lewis and Alspach lied about where they had been; 8) The canine alerted on Alspach's vehicle; 9) Lewis was fidgety and "acting suspicious" when Lieutenant Walker got near his waist. Based on all of these circumstances, the trial court found that there was probable cause to arrest Lewis. (Tr. at 234-241).

{¶40} Lewis now argues on appeal that the trial court erred by overruling his suppression motion. Specifically, he argues that: 1) the police had no authority to stop Alspach's vehicle; 2) the police did not have any reliable information that Lewis was in the vehicle prior to observing him at the rest area on October 29, 2015; and 3) the totality of the circumstances did not provide the State with probable cause to arrest Lewis.

---

[10] Although Lieutenant Walker did not offer testimony on the matter, the video from the body camera showed the officers implying that since it took Alspach 10-15 seconds to pull-over after Lieutenant Walker activated his lights, there was time for Lewis or Alspach to hide the drugs on their person.

**{¶41}** First, Lewis challenges the trial court's ruling by arguing that there was no authority to stop Alspach's vehicle. However, there were multiple reasons for stopping Alspach's vehicle, and the trial court stated them in its analysis of this issue. Captain Greathouse clearly testified that he was pacing Alspach's vehicle, albeit at a bit of a distance, and that Alspach's vehicle was going at least 55 mph in a 35 mph zone, which amounted to a speeding violation. This on its own was sufficient to justify a stop.[11] Nevertheless, the State argued, and trial court found, that there was also sufficient reasonable articulable suspicion to conduct a Terry stop of Alspach's vehicle based on the investigation up to that point and the oral holder that was given from Alspach's supervising officer to detain her. All that is required for a Terry stop is a reasonable articulable suspicion of criminal activity. *State v. Palmer*, 2d Dist. Montgomery No. 26862, 2016-Ohio-3359, ¶ 19, quoting *State v. Fears,* 8th Dist. Cuyahoga No. 94997, 2011-Ohio-930 ¶ 5, citing *Illinois v. Wardlow,* 528 U.S. 119, 123 (2000) (" 'Reasonable, articulable suspicion' is a 'less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence.' ").

**{¶42}** Here, at the time Alspach's vehicle was stopped, the police had acquired information from confidential informants that Lewis was purchasing and

---

[11] While Lewis argues that it was dark outside and there was a car between Alspach's vehicle and the tailing vehicle, the trial court found Captain Greathouse's testimony credible that he could observe the vehicle speeding through his pacing.

transporting drugs while a passenger in Alspach's vehicle. The vehicle went to locations on a specified route that were not only areas of known drug activity but also corroborative of the information provided by the confidential informant. Therefore, we cannot find that the trial court erred in finding that either the speeding or the Terry stop were valid reasons to stop Alspach's vehicle; however, even if one reason was weak or invalid to stop the vehicle, the other was valid, therefore Lewis's argument is not well-taken.

{¶43} Next, Lewis argues that the State could not establish through eye-witness testimony that he was in Alspach's vehicle when it was in Columbus. However, a logical inference can be made based on the fact that Lewis was in the vehicle at the rest area when Alspach's vehicle was returning north to Bucyrus, where he lived, in addition to the fact that the confidential informant had stated Lewis travels to the particular area to purchase drugs. Thus Lewis's argument is not well-taken.

{¶44} Finally, Lewis argues that the totality of the circumstances did not support his arrest. In an attempt to suggest that the evidence presented was insufficient to establish probable cause to arrest Lewis, or that the weight of the evidence was against finding probable cause, he cites *State v. Kay*, 9th Dist. Wayne No. 09CA0018, 2009-Ohio-4801. In *Kay*, the Ninth District Court of Appeals affirmed a trial court's decision to suppress evidence in the following

circumstances. Kay was a passenger in a vehicle that was stopped for making an improper turn near a known drug house. The officer approaching the vehicle observed Kay moving his body around when the officer approached. The officer had a canine unit sniff the vehicle, which alerted, but no drugs were found inside the vehicle. The driver consented to a search of his person; however, Kay refused to allow the officers to search him and began to walk away. Kay was then placed under "investigative detention," searched, and a crack pipe was found on him. *Kay* at ¶ 5. The trial court found that the officers lacked probable cause to search Kay. On appeal, the State argued that the dog's alert on the vehicle coupled with a search of the driver revealing no contraband led to the conclusion that drugs were on Kay's person, permitting a search. The Ninth District Court of Appeals disagreed with the State, and agreed with the trial court that those circumstances were insufficient to allow for a warrantless search of Kay's person.

{¶45} We find *Kay* readily distinguishable from this case, where there were a number of factors not present in *Kay* that indicated Lewis was involved in drug activity. In our own review of the evidence, we first would emphasize that the officers had information from multiple confidential informants indicating that Lewis was purchasing heroin in Columbus, that Lewis was a passenger in the vehicle during such purchasing excursions, that Lewis kept the drugs on his person during the return-trips, and that Alspach was driving Lewis for at least some of the

purchases. Second, the officers had knowledge that the Schrock Road area was a known drug area and from the GPS data they were able to discern that Lewis made three short and suspicious stops on October 29, 2015, including at Schrock Road. The officers were able to visually identify Lewis in Alspach's vehicle at a rest area when the car was returning to Bucyrus. Then, during the traffic stop, Lewis and Alspach gave arguably conflicting stories about where they were coming from—at the very least Lewis was not forthcoming. Lewis acted nervous and fidgety when he was patted down for weapons, but not while the canine search of the vehicle was being conducted. And, lastly, the canine alerted on the vehicle.[12]

{¶46} Thus there were a number of factors here that far exceed what existed in *Kay*. If officers had simply stopped Alspach's vehicle for speeding in this case, done a canine sniff and found nothing inside the vehicle with no additional information regarding who Lewis was or his activity, then perhaps this case would be different.[13] However, when Lieutenant Walker arrested Lewis at the direction of his superior officers, the decision was made with full knowledge of all the previously mentioned information related to Lewis's activity. Thus *Kay* is fundamentally different than this case.

---

[12] On appeal, Lewis does not seem to contest the length of time before the canine search as he did at the trial court. To any extent that Lewis does maintain this argument, we do not find it well-taken given that the canine officer testified that he was on scene at the stop immediately and the search was done just over five minutes later.

[13] We wish to emphasize, however, that we are not endorsing the decision made by the Ninth District in *Kay*.

{¶47} Moreover, a partial dissent in *Kay* stated that, "[The] [d]og alerting on a vehicle, by itself, was not sufficient to establish the probable cause required to conduct a search of Kay's person. However, dog alerting on a vehicle, coupled with other factors, may be sufficient to establish probable cause to conduct a search on a person depending on the circumstances."[14] *State v. Kay*, 9th Dist. Wayne No. 09CA0018, 2009-Ohio-4801, ¶ 25 (Carr, J., dissenting in part). Those other circumstances are precisely what are present in this case.

{¶48} Based on the evidence presented we find that under totality of the circumstances, probable cause existed to arrest Lewis. Therefore, we cannot find that the trial court erred in overruling Lewis's suppression motion. His arguments are not well-taken and his assignment of error is overruled.

{¶49} Having found no error prejudicial to Lewis in the particulars assigned, Lewis's assignment of error is overruled and the judgment of the Crawford County Common Pleas Court is affirmed.

*Judgment Affirmed*

**WILLAMOWSKI, J., concurs in Judgment Only.**

**ROGERS, J., dissents.**

**/jlr**

---

[14] The trial court specifically addressed and distinguished *Kay* on the record at the suppression hearing when overruling Lewis's motion, finding this case more analogous to a case that the *Kay* court distinguished to reach its conclusion.