J-A22003-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| DARRYL WHITE, | |
| Appellee | No. 103 EDA 2017 |

Appeal from the Order Entered November 28, 2016
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0012105-2015

BEFORE:  BENDER, P.J.E., NICHOLS, J., and STEVENS,  P.J.E.[*]

CONCURRING AND DISSENTING MEMORANDUM BY BENDER, P.J.E.:  **FILED FEBRUARY 08, 2019**

The Majority concludes that Appellee ran, 'unprovoked,' from police in a high crime area and, on that basis, it reverses the order of the trial court granting suppression.  While I concur with the Majority that the trial court's express reasoning for granting suppression is unsustainable, I disagree with the Majority's conclusion that the trial court's factual findings clearly support the denial of Appellee's suppression claim in the circumstances of this case. Accordingly, I respectfully concur in part and dissent in part.

Here, the trial court and both parties agree that Officers Trani and Beck attempted to conduct a ***Terry*** stop of Appellee and, thus, reasonable suspicion

---

[*] Former Justice specially assigned to the Superior Court.

that criminal activity was afoot was required. However, the parties disagree as to when that seizure actually occurred during the course of events at issue, which is a crucial matter here and, as discussed below, not entirely clear from the record. Appellee relies on the trial court's apparent conclusion that a *Terry* stop effectively occurred when Officer "Trani and [Appellee] caught each other's eye," because, in the court's view, that "could have given [Appellee] the impression that he was being approached with the obvious intention to detain and question him[.]" Trial Court Opinion (TCO), 1/19/17, at 5. The decision to suppress naturally flows from such a conclusion because, at that point in time, the officers, by their own admission, had not observed Appellee engage in any suspicious activity.

I agree with the Majority that the trial court's legal conclusion in that regard was erroneous. Neither the trial court nor Appellee provided this Court, nor has this Court independently discovered, any case law suggesting that a seizure (investigative detention or otherwise) can occur, much less does occur, when a police officer merely makes eye contact with a citizen, absent any verbal commands or physical restraint. Thus, like the Majority, I would specifically reject the notion that eye contact with a police officer can, by itself,[1] lead a reasonable person to believe that they are not free to leave the

---

[1] For purposes of addressing a 4th Amendment claim, eye contact between an officer and a citizen may be a relevant fact in some circumstances, such as when there is a dispute regarding the target of a verbal command that effectuates a seizure. No such dispute is present in this case.

presence of law enforcement. To hold otherwise is to convert practically all 'mere encounters' into 'investigative detentions.'

Having rejected the trial court's legal conclusion in that regard, I would then turn to consider whether there is an alternative legal basis upon which to affirm the trial court's suppression order.[2] As discussed below, because the trial court failed to make crucial factual and/or credibility determinations, I am unable to affirm the suppression order on alternative legal grounds at this time. Nonetheless, I am also disinclined to reverse the suppression court's order, because there are potential factual and credibility determinations that could still support the suppression of the seized firearm.

First, unlike the Majority, I cannot discern from the record or the trial court's opinion whether the events of this case occurred in a high crime area. This is an essential fact in this case, as it is now axiomatic that, in a high crime area, an individual's "flight upon noticing the police"[3] provides the police with reasonable suspicion to conduct a **Terry** stop of that individual (hereinafter the "**Wardlow** Rule"). **Illinois v. Wardlow**, 528 U.S. 119, 124 (2000); **but**

---

[2] "[A]n appellate court … may affirm on any legal basis supported by the certified record." **Commonwealth v. Torres**, 176 A.3d 292, 297 n.5 (Pa. Super. 2017) (quoting **Commonwealth v. Williams**, 125 A.3d 425, 433 n.8 (Pa. Super. 2015)).

[3] I continue to object to the ubiquitous-yet-misleading use of the term *unprovoked* to modify the term *flight* in this context. Logically speaking, flight is rendered more suspicious when it is *provoked* by the arrival of police than when it is not.

*see Florida v. Royer*, 460 U.S. 491, 498 (1983) (noting that an individual "may go on his way" without arousing any additional suspicion when in the presence of police officers); *Commonwealth v. Washington*, 51 A.3d 895, 899 (Pa. Super. 2012) (holding that no additional suspicion arises from flight unless the individual is *knowingly* running from police).[4]  Here, Officer Trani first testified that it was a high crime area based upon "multiple gun arrests." N.T. Suppression , 8/11/16, at 6.  However, the ensuing inquiries by the trial court demonstrated that Officer Trani had not made that claim based upon personal observation but, instead, because he had been informed by others that there had been "multiple shootings in the area." *Id.* at 6-7.  Officer Trani had personally only made arrests in that area "for domestic incidents." *Id.* at 6.

The trial court's opinion is somewhat ambiguous as to whether it accepted Officer Trani's statement as fact.  In its summary of the facts, the trial court merely recited Officer Trani's testimony.  TCO at 2.  At the conclusion of the court's factual summary, it stated that "[t]here are a number of possible interpretations that can be derived from all of that testimony[,]" strongly suggesting that it had not provided a factual summary at all but, instead, a summary of testimony from which multiple factual summaries could be derived.  *Id.* at 5.  Later, in addressing a specific argument by the

---

[4] Thus, synthesizing these authorities, the **Wardlow** Rule does not apply to an individual who merely walks away from police in a high crime area, nor does it apply to an individual who, although running in a high crime area, is unaware that police are observing him.

Commonwealth, the trial court stated, "[t]hat the incident occurred in a high crime area is irrelevant[,]" suggesting, momentarily, that the court had determined that it was a high crime area. *Id.* at 9. However, later in the opinion, the trial court clearly expressed doubt regarding the same fact, opining that Officer Trani's "description of the area as having been the site of an unspecified number of shootings and undescribed 'multiple gun arrests' and his having [also] made an … unspecified number of arrests for 'domestic incidents' would render ninety-nine percent of all of the city of Philadelphia's neighborhoods high crime areas…." *Id.* at 11. Elsewhere in the opinion, the trial court stated that it could "concede *for purposes of this discussion* that the state would be able to establish more comprehensively that [Appellee] was in a high crime area at the time…." *Id.* at 6 (emphasis added). However, the Commonwealth did not provide evidence to corroborate Officer Trani's claim, and the conditional nature of the trial court's statement further indicates that it had endeavored to reach a legal conclusion regarding suppression *without making a final factual determination regarding whether the high-crime-area label applied in this case*. Thus, rather than reversing the order granting suppression, I would instead vacate that order and remand for a determination as to whether the *Terry* stop at issue occurred in a high crime area. I would leave it to the trial court to determine whether it can make a factual assessment with the record as it is, or whether additional testimony and/or evidence is required to make such a determination.

Second, the trial court did not provide this Court with definitive factual findings regarding the timeline of events. Specifically, I am unable to ascertain precisely when Officer Trani gave chase (or ordered Appellee to stop) in relation to Appellee's actions because I am unable to discern what aspects of Officer Trani's testimony, if any, the trial court found credible. As noted above, the trial court directly suggested that there were "a number of possible interpretations" applicable to its summary of the Commonwealth witnesses' testimony. TCO at 5. Moreover, the court identified "inconsistencies in the various versions" of the officers' testimony, leading it to conclude that "the prosecution failed to establish" its version of the facts, but the court did not resolve these factual discrepancies in its Pa.R.A.P. 1925(a) opinion in a manner that is clear to me. *Id.*

It only appears undisputed that, after Appellee made eye contact with Officer Trani, he began walking away, but then later started running. If Officer Trani began his pursuit or ordered Appellee to stop before Appellee reached for his waistband and before he began running, there would be no reasonable suspicion to stop him, even if these events occurred in a high crime area. On the other end of the spectrum, if the pursuit or order to stop occurred after Appellee began running, and after the waistband-grabbing action, coupled with a finding that this was a high crime area, there is no doubt that Officer Trani possessed a reasonable suspicion to conduct a *Terry* stop. Given these ambiguities in the trial court's factual findings, both with regard to the timeline of events and the nature of the neighborhood, I would decline to speculate as

to whether a ***Terry*** stop was justified for the myriad of factual possibilities that fall in the middle of that spectrum that I just described.  Instead, I would remand this matter for further credibility and factual determinations.

For these reasons, I respectfully concur in part and dissent in part.